(31 P.3d 982)

No. 83,907

NORTHWEST ARKANSAS MASONRY, INC., *Appellant*, v. SUMMIT SPECIALTY PRODUCTS, INC., *Appellee*, and MATERIALS PACKAGING CORPORATION and ASH GROVE, CEMENT COMPANY, *Appellees/Cross-appellants*.

Opinion filed September 14, 2001.

*Scott C. Long, Jeff S. Bloskey*, and *Michael W. Shunk*, of McCormick, Adam & Long, P.A., of Overland Park, for appellant.

*Richmond M. Enochs*, of Wallace, Saunders, Austin, Brown & Enochs, Chartered, of Overland Park, for appellee Summit Specialty Products.

*Roy Bash* and *Richard M. Paul III*, of Shughart Thomson & Kilroy, P.C., of Kansas City, Missouri, for appellees/cross-appellants.

Before KNUDSON, P.J., JOHNSON, J., and PADDOCK, S.J.

PADDOCK, J.: This is a products liability case concerning an alleged product defect in Type S masonry cement powder purchased by Northwest Arkansas Masonry, Inc., (Northwest) from Summit Specialty Products, Inc. (Summit), a supplier, manufactured by Ash Grove Cement Company (Ash Grove), and packaged by Materials Packaging Corporation (Materials Packaging).

Northwest sued the supplier, manufacturer, and packager under product liability and contract theories. The trial court granted summary judgment in favor of Summit and entered judgment as a matter of law for Ash Grove and Materials Packaging following a jury verdict in favor of Northwest. Northwest appeals both judgments. Ash Grove and Materials Packaging jointly filed a cross-appeal. Northwest has moved for our order to dismiss the cross-appeal as untimely.

## The facts

Northwest subcontracted to perform the masonry work in the Home Depot store being built in Olathe, Kansas. The work consisted of building the outer walls of the store for which Northwest was to receive $666,700. Northwest's contract required it to purchase all the necessary materials to construct the masonry walls of the building. The materials included concrete block, rebar, spacers and connectors, masonry cement, insulation, and various other products.

Northwest purchased Type S masonry cement powder from Summit. Type S masonry cement powder is a premixed product containing Portland cement and lime. Northwest made Type S mortar at the construction site by mixing the Type S masonry cement powder with sand and water. The significance of Type S mortar is that it will, if properly mixed, achieve a minimum bonding strength of 1,800 pounds per square inch and meet the plans and specifications of the contract.

In constructing the masonry wall, Northwest used the mortar it made at the construction site to bind the layers of concrete block in the wall. The wall was made by laying concrete blocks, inserting rebar in the blocks' cells at various intervals, and then filling the cells with mortar.

Several days into the project, Northwest discovered the mortar was not hardening properly. Testing confirmed the mortar was not meeting specified strengths. The general contractor ordered Northwest to tear down the walls after 20,000 concrete blocks had been laid and bonded together with the mortar made with Ash Grove's Type S cement product.

Prior to trial, the district court granted Summit's motion for summary judgment on all pending claims. Northwest proceeded to jury trial against Ash Grove and Materials Packaging. Ultimately, Northwest presented only its strict liability claim to the jury.

As part of its claim, Northwest presented itemized damages to the jury by exhibits and testimony. The jury returned a verdict finding Northwest 15% at fault, Ash Grove 42.5% at fault, and Materials Packaging 42.5% at fault. The damages awarded totaled $124,540.64 after deducting Northwest's fault percentage.

Upon motion by Ash Grove and Materials Packaging, the district court entered judgment as a matter of law in favor of Ash Grove and Materials Packaging. The court set aside the jury verdict on the basis that the damages awarded were entirely barred as a matter of law by the economic loss doctrine set forth in *East River Steamship Corp. v. Transamerica Delavel, Inc.*, 476 U.S. 858, 90 L. Ed. 865, 106 S. Ct. 2295 (1986); Koss *Construction v. Caterpillar, Inc.*, 25 Kan. App. 2d 200, 960 P.2d 255, *rev. denied* 265 Kan. 885 (1998); and *Elite Professionals, Inc. v. Carrier Corp.*, 16 Kan. App. 2d 625, 827 P.2d 1195 (1992).

### The summary judgment

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. K.S.A. 60-256(c). On appeal, we apply the same rules, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citation omitted.]" *Jackson v. U.S.D. 259*, 268 Kan. 319, 322, 995 P.2d 844 (2000).

"An issue of fact is not genuine unless it has legal controlling force as to the controlling issue. The disputed question of fact which is immaterial to the issue does not preclude summary judgment. If the *disputed fact*, however resolved, could not affect the judgment, it does not present a genuine issue of material fact.

[Citation omitted.]" (Emphasis added.) *Bergstrom v. Noah*, 266 Kan. 847, 872, 974 P.2d 531 (1999).

Of all the claims filed by Northwest against Summit, the only issue raised on appeal concerns the breach of contract claim. In its second amended petition, Northwest alleged Summit breached the purchase contract between Northwest and Summit "by providing Type S Masonry Cement that did not comply with the industry standard, and was therefore defective." Prior to trial, Summit filed for summary judgment and set forth 18 uncontroverted facts, of which Northwest admitted 17.

Northwest challenged the following factual statement asserted by Summit: "16. Plaintiffs were *never told* what the problem was with the mortar." (Emphasis added.) Northwest disputed that fact by stating: "Plaintiff *was told* that mortar made using Type S masonry cement sold by defendant Summit failed to meet the required strengths, but *was not told* of the specific cause of said failure." (Emphasis added.) Northwest further alleged in its response that because the masonry cement provided by Summit did not result in mortar meeting the minimum required bonding strength, a "question of 'material fact' [exists] for the jury to determine whether defendant Summit did, in fact, provide Type S masonry cement which it agreed, or contracted, to provide."

The district court granted summary judgment on two bases: First, it determined the factual statement challenged by Northwest was not material to granting summary judgment on the breach of contract claim. A breach of contract occurs when there is a failure of performance of a duty arising or imposed by agreement. *Hunt v. KMG Main Hurdman*, 17 Kan. App. 2d 418, Syl. ¶ 2, 839 P.2d 45 (1992). The district court correctly determined that what Northwest was told about either the cement or the mortar was immaterial to the issue of whether Summit fulfilled its duty to deliver Type S cement.

Second, the court determined the additional facts and allegations in Northwest's response were not sufficient to establish an issue of material fact as to its claim in the petition that Summit failed to deliver Type S cement as ordered. The additional facts Northwest set forth in its response are as follows:

"Type S masonry cement is used to make Type S masonry mortar for use in concrete masonry construction. The designation 'Type S' with respect to masonry mortar indicates the mortar will have a bonding strength of at least 1,800 pounds per square inch ('PSI') after a particular curing period. The designation 'Type S' as applied to a masonry cement means that the masonry cement, when mixed with appropriate proportions of sand and water will result in a Type S mortar meeting the 1,800 PSI minimum bonding strength."

Northwest contends these additional facts "at a minimum establish a question of fact as to whether Summit did or did not provide [Northwest] with Type S masonry cement." To support its position, Northwest relies on *National Gypsum Co. v. Dalemark Industries, Inc.*, 773 F. Supp. 1476 (D. Kan. 1991). The district court considered this case and found Northwest's case distinguishable. We agree.

In *National Gypsum*, plaintiff NGC contracted with defendant Dalemark for a specific type of ink known as 607. Dalemark contracted with another entity, AIJ, to have 607 ink made and shipped. AIJ made a drum of ink, placed 607 labels on it, and shipped it to NGC. The record established the drum actually contained 115 ink, a different product, and was mislabeled. Five days later, AIJ made a drum of 607 ink, correctly labeled it as 607 ink, and shipped it to NGC. *National Gypsum*, 773 F. Supp. at 1479.

NGC claimed the ink it used to label its wallboard product was defective as it bled through tape, paint, and joint compound. It moved for summary judgment on its claims, including breach of contract, claiming, in essence, it was uncontroverted that what it ordered was not what was delivered. The court disagreed and denied the motion. To challenge summary judgment, Dalemark came forward with shipping documents to support an inference that the mislabeled drum was diverted to Dalemark and never reached NGC. It also produced test results indicating the "bleeding ink" contained ingredients not used by AIJ in formulating and manufacturing the ink for Dalemark. Although AIJ admitted there was a change in its 607 formulation, it denied this change caused the ink to bleed. Furthermore, AIJ maintained a later-produced drum of ink made with the same formula and shipped to Dalemark did not bleed.

In contrast, Northwest merely points to the alleged failure of the mortar "to harden as it should" and claims that is adequate proof to create an issue of fact that what was in the bag labeled "Type S cement" was not Type S cement but something other than what was ordered. Because it did not get what it ordered, Northwest claims, Summit breached its duty under the contract.

Unlike *National Gypsum,* no evidence of mislabeling, nonconformity, or alteration of the powdered cement substance was presented at the summary judgment stage which would cause reasonable minds to conclude that anything other than Type S cement was delivered. In fact, Northwest agreed that 640 of the 920 bags were not even delivered by Summit; the remaining bags were only in Summit's custody and control during transportation; and as a distributor, "Summit . . . would never change or alter the material in any way, or open or change the wording on the bag of masonry cement." Furthermore, Northwest accepted as fact that as a distributor, Summit "would not perform any services to check that the actual material in the bags marked Type-S was actually Type-S masonry cement . . . ."

The additional facts set forth by Northwest do not create an issue of fact as to the substance or nature of the contents in the bags delivered to the site. The district court did not err in granting Summit summary judgment.

It should be noted that references by Northwest to facts in the trial transcript are not properly to be considered in deciding if the trial court erred in granting summary judgment for Summit. Only those facts, pleadings, and exhibits presented to the trial court at the summary judgment stage are to be considered in analyzing the summary judgment issue.

### The judgment notwithstanding the verdict

At trial, Northwest relied on strict liability to base its claim against Ash Grove and Materials Packaging. Its evidence to establish harm related to costs incurred as a consequence of having to tear down the wall and rebuild it when the mortar did not harden. Essentially, Northwest claimed the costs were the result of Ash Grove's cement product failing to meet Northwest's expectations

when Northwest made and used the mortar to construct the masonry wall. The costs claimed consisted of (1) the initial cement used to make mortar; (2) additional materials to rebuild the wall; (3) housing and furniture rental for its employees; (4) additional equipment rental; (5) debris hauling; (6) additional subcontractor labor; (7) additional payroll; (8) additional fuel and miscellaneous costs for equipment; and (9) lost profits. The claims totaled $236,690.32. The jury declined to award for lost profits but awarded Northwest $146,518.40 in damages.

In setting aside the verdict and entering judgment as a matter of law for Ash Grove and Materials Packaging, the trial court found the "damages as alleged and proved by Plaintiff and which make up the jury's determination of damages are . . . economic losses as defined in the relevant case law." The trial court also determined "[e]conomic loss damages are not recoverable under a strict liability cause of action because no tort duty exists obligating a defendant to protect a plaintiff's economic interests. [Citations omitted.]"

Northwest timely appealed. However, on appeal, Northwest in its brief seeks recovery for only $54,834.54 as costs of "additional materials," including "concrete blocks, rebar, grout, insulation and other hardware to which [Ash Grove's] product had been applied." In its brief, Northwest made no attempt to classify or brief the nature of the other categories of damages it claimed at trial. Issues not briefed are deemed abandoned. *Bergstrom*, 266 Kan. at 873.

Whether the trial court erred in concluding the economic loss doctrine barred recovery for damages under a strict liability cause of action is a question of law subject to unlimited review. *Koss*, 25 Kan. App. 2d at 201. In *Koss*, the court adopted the economic loss doctrine set forth in *East River* and held a commercial buyer of defective goods could not sue in negligence or strict liability when the only injury consisted of damage to the goods themselves. 25 Kan. App. 2d at 207. On the other hand, recovery for physical damage a product caused to "other property" is not precluded by the economic loss doctrine. *Saratoga Fishing Co. v. J. M. Martinac & Co.*, 520 U.S. 875, 879, 138 L. Ed. 2d 76, 117 S. Ct. 1783 (1997). The economic loss doctrine applies to both consumer and commercial buyers of defective products. See *Jordan v. Case Corp.*, 26

Kan. App. 2d 742, 744, 993 P.2d 650 (1999), *rev. denied* 269 Kan. 933 (2000) (expanding the economic loss doctrine to both consumer and commercial purchasers of defective products and holding that a defective engine was a component part of a combine and, thus, plaintiff was seeking unrecoverable damages for harm caused by damages to the product itself).

On appeal, Northwest classifies its damages as harm to "other property." We are not persuaded with Northwest's classification of its damages for several reasons:

First, although the parties have not considered the effect of the Kansas Product Liability Act on the issue, the Act offers guidance in this case. See K.S.A. 60-3301 *et seq.* The Act applies to all product liability claims regardless of the substantive theory of recovery. *Savina v. Sterling Drug, Inc.*, 247 Kan. 105, 126, 795 P.2d 915 (1990). Under the Act, a product liability claim, including one based on strict liability, can be "brought for harm caused by the manufacture, production, making, construction, fabrication, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging, storage or labeling of the relevant product." K.S.A. 60-3302(c). " 'Harm' includes: (1) Damage to property; (2) personal physical injuries . . .; (3) mental anguish . . . . The term 'harm' does not include direct or consequential economic loss." K.S.A. 60-3302(d).

The Act does not define direct or consequential economic loss. However, case law considering the term (though not within the context of the Act) indicates economic loss includes damages for inadequate value, costs of repair, replacement costs, and loss of use of the defective product. *Koss*, 25 Kan. App. 2d at 206 (citing *Elite Professionals, Inc. v. Carrier Corp.*, 16 Kan. App. 2d 625, 633, 827 P.2d 1195 [1992]). Generally, economic loss is a result of the failure of the product to perform to the level expected by the buyer, which is the core concern of traditional contract law. See, *e.g., East River*, 476 U.S. at 870. We conclude that the *Koss* holding of what constitutes economic loss would also apply to the term "economic loss" as used in K.S.A. 60-3302(d).

At trial, Northwest characterized its damages as follows: First, all 15 exhibits produced at trial to establish "harm" related to costs

incurred as a consequence of having to tear down the wall and rebuild it when the mortar did not harden. Northwest ultimately made the decisions to (1) tear down and rebuild the wall and (2) replace, rather than reuse the cement block. Second, the project manager testified the defective condition of Ash Grove's cement that was used to prepare the mortar posed a risk of property damage for Northwest "[b]ecause they had to tear [the wall] down and rebuild it in order to get paid."

Actually, what Northwest is seeking is repair and/or replacement costs rather than damage to "other property." Thus, the damages constitute economic losses which are not included as a type of harm recoverable under a products liability claim. K.S.A. 60-3302(c) and (d). Essentially, the costs are a result of Ash Grove's cement product failing to meet Northwest's expectations when Northwest made and used the mortar to construct the masonry wall.

Next, the dissenting opinion in *Saratoga* made a specific point of discussing the law related to "other property" on construction projects and noted the growing trend in many jurisdictions to interpret 'economic loss' broadly to include damage that formerly was considered "other property." 520 U.S. at 891.

Recognizing the difficulty in deciding what constitutes harm to the product itself versus harm to other property when a component part of a machine or a system destroys the rest of the machine or system, the Restatement (Third) of Torts acknowledges the "integrated system" approach. "When the product or system is deemed to be an integrated whole, courts treat such damage as harm to the product itself. When so characterized, the damage is excluded from the coverage of this Restatement." Restatement (Third) of Torts: Products Liability § 21, comment e (1997).

Several jurisdictions apply the integrated system approach in construction and building defect cases. These cases are persuasive and consistent with the approach taken in *Koss* and *Jordan*. For example, recovery under a products liability action was barred when defective roofing products and design resulted in substantial repair and replacement costs. See *Jones & Laughlin Steel v. Johns-Manville Sales*, 626 F.2d 280 (3d Cir. 1980). Removal and replacement of untreated plywood, shingles, and other components of a

builder's roof system were not recoverable damages to other property when the builder had to replace chemically treated plywood that was failing to maintain strength and structural integrity. See *Pulte Home Corp. v. Osmose Wood Preserving, Inc.*, 60 F.3d 734, 742 (11th Cir. 1995). Paving blocks were determined integrated systems and the cost to repair and replace incurred because of defective cement ingredients could not be recoverable under a products liability claim. *Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 251-53, 593 N.W.2d 445 (1999). Where faulty cement caused reinforcing steel inserted in concrete to rust causing concrete to crack and break off, a homeowner's tort claim was barred because the damage was economic loss as no property other than the structures built with defendant's cement sustained damage. *Casa Clara v. Charley Toppino and Sons*, 620 So. 2d 1244, 1247 (Fla. 1993).

These cases stand for the proposition that when component materials become indistinguishable parts of a final product, and there is harm resulting from a defective component of the product, the product itself has caused the harm.

We conclude, as did the Wisconsin court in *Wausau*, that "[d]amage by a defective component of an integrated system to either the system as a whole or other system components is not damage to 'other property' which precludes the application of the economic loss doctrine." 593 N.W.2d at 452.

Here, the masonry wall was an integrated system composed of several component materials that were indistinguishable parts of the final product; thus, harm caused by the defective cement was harm to the final product, the wall itself.

Finally, from a policy perspective, the *Jordan* court adopted the general policies of the economic loss rule from *East River* to support applying the rule to consumer purchasers. 26 Kan. App. 2d at 744. Applying those policies here, Northwest was best situated to assess the risk of economic loss and insure against it. A product costing less than 1% of the total contract sum could jeopardize the entire project. Northwest could have utilized various risk management principles, such as testing, alternate suppliers, or alternate methods of making mortar, to assess and spread its risk. Also, it

could have allocated its risk either by contract with Summit or the general contractor.

Northwest's last argument is that the economic loss rule does not apply when the plaintiff has no contractual remedy. It contends that under *East River*, the rule "presumes the existence of a contractual remedy against the product manufacturer." This argument is flawed for three reasons: First, notwithstanding *East River*, under the Kansas Product Liability Act, both direct and consequential economic loss are not included as recoverable "harm." K.S.A. 60-3302(c). Second, "some forms of economic loss have traditionally been excluded from the realm of tort law even when the plaintiff has no contractual remedy for a claim." Restatement (Third) of Torts: Products Liability § 21, comment a (1998). Finally, consumers are not typically in privity of contract with the manufacturer when they purchase products from retailers or wholesalers. Nevertheless, the economic loss rule applies equally to consumer purchasers. *Jordan*, 26 Kan. App. 2d at 744.

The damages claimed by Northwest are economic losses resulting from failed economic expectations and not damage to other property. Northwest purchased the cement and made it into mortar. Northwest integrated the mortar and other components into a final product—the masonry wall. The damages claimed by the cost of additional materials were repair and replacement costs and occurred as a result of tearing down the wall because the mortar made with the cement that the jury found defective, failed to meet required bonding strengths.

Therefore, under both the Kansas Product Liability Act and relevant case law addressing the economic loss rule as applied to construction or building product defects, the trial court did not err in barring Northwest's strict liability claim by granting Ash Grove/Materials Packaging's motion for judgment as a matter of law.

We need not consider the cross-appeal of Ash Grove/Materials Packaging as that issue is moot.

Affirmed.