**LEXINGTON INSURANCE COMPANY, Plaintiff,**

v.

**WESTERN ROOFING COMPANY, INC., Defendant.**

No. 03–2036–JWL.

United States District Court, D. Kansas.

May 7, 2004.

Amy M. Decker, Scott R. Schillings, Cozen & O'Connor, Wichita, KS, James D. Dendinger, Cozen & O'Connor, Dallas, TX, for Plaintiff.

Steven R. Fabert, James P. Nordstrom, Fisher, Patterson, Sayler & Smith, Topeka, KS, T. Bradley Manson, Shapiro, Manson & Karbank, Overland Park, KS, for Defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

This is an insurance subrogation case arising from the collapse of a roof on an office/warehouse building. Plaintiff Lexington Insurance Company ("Lexington") seeks to recover from defendant Western Roofing Company ("Western Roofing") for amounts Lexington paid as a result of the roof collapse. The matter is presently before the court on Western Roofing's motion for summary judgment (Doc. 44). For the reasons explained below, the court will grant this motion with respect to Lexington's tort claim, but will deny the motion with respect to Lexington's contract and warranty claims.

## STATEMENT OF MATERIAL FACTS

The office/warehouse building that is the subject of this lawsuit is owned by The Westroads Limited Partnership ("Westroads"). Westroads does not occupy or manage the building. At the time the roof collapsed, the building was occupied by a tenant, Schlage Lock.

The building is managed by The Mid-America Management Company ("Mid-America") pursuant to a management agreement with Westroads.[1] The manage-

---

1. Western Roofing argues the court should disregard this management agreement because Lexington did not produce it in response to a discovery request from Western Roofing. The court will not consider this argument because it was raised for the first time in Western Roofing's reply brief. *See Minshall v. McGraw Hill Broadcasting Co.,* 323 F.3d 1273, 1288 (10th Cir.2003) (argu-

ment raised for the first time in reply brief is waived); *Coleman v. B–G Maint. Mgmt.,* 108 F.3d 1199, 1205 (10th Cir.1997) (issues not raised in the opening brief are deemed abandoned or waived). Moreover, this argument essentially seeks affirmative relief under Fed. R.Civ.P. 37(c)(1) and, as such, Western Roof-

ment agreement required Mid–America to "obtain, renew, and replace all policies of insurance insuring the property and the fixtures." Mid–America also agreed to "negotiate and settle directly with any insurance carrier, any insurance claims for damage to the property or fixtures."

There is, in turn, an advisory services agreement between Westroads as "Owner" and CB Richard Ellis [2] as "Agent." This agreement generally provides that Westroads will pay CB Richard Ellis to oversee the management and tenant relations at the building. The Westroads signature block is signed by William Staebler as vice president for Mid–America.

Western Roofing installed the original roof on the building in 1980. Western Roofing was not, however, the subcontractor that installed the downspouts on the building originally. Further, Western Roofing did not design the roof. The architect who designed the roof did not require overflow scuppers to be installed. Overflow scuppers would have served as a precautionary measure that would have allowed water to exit the roof if the downspouts had become clogged. Plaintiff does not contend that Western Roofing should be held liable for the fact that the building was arguably defectively designed when it was built because of the absence of overflow scuppers.

From 1998 through 2000, CB Richard Ellis made a number of calls to Western Roofing to repair building leaks. Some of these incidents revealed a recurrent problem with dead pigeon carcasses clogging the downspouts, causing rainwater to back up. The pigeon carcasses were located in a bend of the downspouts at ground level.

Mr. Lanning testified in his deposition that "[t]he incidents with pigeons involved pigeons on the bottom of the downspouts and waters [sic] flowing into tenant spaces were out of the downspouts. It did not back-up on the roof." At first, in an attempt to remedy this pigeon problem, inspection hatches were installed at ground level to allow the dead pigeons to be removed. This, however, did not cure the problem. When the problem recurred, further action was taken.

In June of 2000, Western Roofing removed all of the downspouts from the building, cleaned them and removed the dead pigeons, reinstalled the downspouts, and installed wire screens over the top ends of the downspouts to prevent pigeons from entering the downspouts. Marcus Manson, owner and president of Western Roofing, testified in his deposition that it was mutually agreed among him, Michael Lanning, who is the property manager for CB Richard Ellis, and Kathleen Armstrong, who is with Mid–America, that Western Roofing would install these wire screens. The screens performed their intended function of keeping the dead pigeons out of the downspouts.

Contrary to Mr. Manson's testimony, Mr. Lanning testified in his deposition that he hired Western Roofing to investigate and solve the leak problem associated with the dead pigeons and that he did not have any discussions with Western Roofing about how to solve the problem. According to Mr. Lanning, he regarded Mr. Manson as his "go-to" roofing expert and Mr. Manson had authority to do whatever roofing work needed to be done as long as the

ing should have filed a formal motion on this issue.

**2.** Actually, the party to the agreement is CB Commercial Management Services. According to Mr. Lanning's deposition testimony, CB

Commercial Management Services was the predecessor in interest to CB Richard Ellis. To avoid any confusion regarding what appears to be a non-issue, the court will refer to CB Commercial Management Services as CB Richard Ellis.

work was within certain cost restraints. Mr. Lanning testified that the first time he knew Western Roofing installed the screens over the scuppers was when he, Mr. Manson, and Ms. Armstrong were conducting a routine roof inspection several months after Western Roofing installed the screens.

Western Roofing knew the screens could trap debris, but when the screens were originally installed did not inform anyone from CB Richard Ellis that there could be a problem with debris being trapped at the scupper openings. Nevertheless, CB Richard Ellis's on-site maintenance man, Jim Woosley, was required to fill out a weekly checklist to confirm that he completed assigned tasks, one of which was to check the screens for debris. He was not required to do this on a weekly basis, but was expected to do it at least once a month.

In October of 2000, Western Roofing was called to the Schlage Lock building due to a roof leak. An inspection revealed that foreign material was blocking the screens, preventing rainwater drainage. According to Mr. Manson's deposition testimony, at that time Western Roofing told Mr. Woosley that debris on the screens was the cause of the problem.

On May 3, 2001, a thunderstorm deposited a significant period of rainfall on the roof in less than an hour. Mr. Woosley was called by a tenant in another nearby building also managed by CB Richard Ellis. When Mr. Woosley arrived at that nearby building, the roof on the Schlage Lock building had partially collapsed. Mr. Woosley went up on the roof and observed that the downspouts were completely clogged with debris, leaving water standing on the roof. After the collapse, he reported the cause of the downspout blockage as cottonwood seeds that had been blowing through the air during the storm. He reported that he had last inspected the downspouts approximately a week or two prior to the collapse.

The named insured in Lexington's insurance policy was Mid–America, and Lexington is seeking reimbursement from Western Roofing for amounts Lexington paid under the policy to Mid–America. The insurance policy contains the following subrogation clause:

> The right of subrogation against the insured, affiliated, subsidiary, and associated companies or corporations, the insured's officers, directors, and employees or any other corporations or companies associated with the insured through ownership or management, and at the option of the insured against a tenant, vendor, supplier, or customer of the insured, is waived.

The subrogation receipt provides:

> In consideration of and to the extent of said payment [Mid–America] hereby subrogates [Lexington] to all of the rights, claims and interest which the undersigned may have against any person or corporation liable for the loss mentioned above, and authorizes [Lexington] to sue, compromise or settle in [Mid–America]'s name or otherwise all such claims . . . .

Based on these facts, Lexington as subrogee for Mid–America asserts claims against Western Roofing for negligence, breach of contract, and breach of express and implied warranty. Western Roofing contends it is entitled to summary judgment on Lexington's negligence claim based on the absence of a legal duty to plaintiff, immunity under the Kansas Products Liability Act ("KPLA"), K.S.A. § 60–3305, and the economic loss doctrine. It contends it is entitled to summary judgment on Lexington's contract and warranty claims on the basis that there is no legal or factual basis for the claims, Lexington is not a third-party beneficiary of the con-

tract between Western Roofing and CB Richard Ellis, Lexington's claims are barred by the subrogation clause in the insurance policy, and Lexington's claims are barred because Western Roofing is entitled to diminish the damages by the amount Lexington paid Mid–America in insurance proceeds.[3]

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union,* 279 F.3d 901, 904 (10th Cir.2002). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding,* 279 F.3d at 904 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In attempt-

ing to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir.2000) (citing *Adler,* 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *see also Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The non-moving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir.2001). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore,* 218 F.3d 1190, 1197–98 (10th Cir.2000) (quoting *Adler,* 144 F.3d at 671). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Adams,* 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every ac-

---

**3.** Western Roofing also raised a variety of other arguments in support of its motion for summary judgment. It appears to the court, however, that all of Western Roofing's arguments other than those listed above are moot given the clarification in Lexington's response memorandum that Lexington is not contend-

ing Western Roofing breached an agreement associated with the original roof installation. Rather, Lexington's claims focus only on Western Roofing's work associated with fixing the leak problem caused by pigeons nesting in the downspouts.

tion.'" *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## ANALYSIS

For the reasons explained below, the court concludes that Lexington's negligence claim is barred by the economic loss doctrine. Lexington has, however, raised genuine issues of material fact regarding the legal and factual basis for its breach of contract and express and implied warranty claims. Further, it appears that Mid–America was in privity of contract with respect to the Western Roofing/CB Richard Ellis contract, and therefore Lexington as subrogee to Mid–America does not need to rely on a third-party beneficiary theory to pursue its claims against Western Roofing. Western Roofing's argument that the subrogation clause in the insurance policy bars Lexington from pursuing claims against Western Roofing is without merit because no evidence in the record suggests that Mid–America waived its claims against Western Roofing. Lexington's breach of contract claims are not diminished by the insurance benefits Lexington paid to Mid–America because Lexington is pursuing the claims against Western Roofing based on a right of subrogation.

## A. Negligence Claim [4]

■ The Kansas Court of Appeals has adopted the economic loss doctrine. *Pren-*

*diville v. Contemporary Homes, Inc.,* 32 Kan.App.2d 435, 83 P.3d 1257, 1259–60 (2004); *Northwest Ark. Masonry, Inc. v. Summit Specialty Prods., Inc.,* 29 Kan. App.2d 735, 741–42, 31 P.3d 982, 986–87 (2001); *Jordan v. Case Corp.,* 26 Kan. App.2d 742, 744, 993 P.2d 650, 652 (1999); *Koss Constr. v. Caterpillar, Inc.,* 25 Kan. App.2d 200, 205–07, 960 P.2d 255, 259–60 (1998).[5] Under this doctrine, a buyer of a defective product is prohibited from suing in tort where the injury consists only of damage to the goods themselves. *Koss,* 25 Kan.App.2d at 207, 960 P.2d at 260. The economic loss doctrine does not, however, bar recovery for physical damage to "other property." *Prendiville,* 83 P.3d at 1264; *Northwest Ark. Masonry,* 29 Kan.App.2d at 741, 31 P.3d at 987. In determining whether the property damage consists of damage to the goods themselves or to "other property," the Kansas Court of Appeals has adopted the integrated system approach set forth in Restatement (Third) of Torts: Products Liability § 21 cmt. e (1997). *Prendiville,* 83 P.3d at 1264; *Northwest Ark. Masonry,* 29 Kan.App.2d at 743–44, 31 P.3d at 988. Under this approach, damage does not constitute damage to "other property" if a defective product is part of an integrated system composed of several component materials that are indistinguishable from the final product. *Northwest Ark. Masonry,* 29

---

**4.** Given the court's conclusion that Lexington's negligence claim is barred by the economic loss doctrine, Western Roofing's arguments that it owed no legal duty to Lexington and that it is immune from liability under the KPLA are moot.

**5.** The Kansas Supreme Court has not addressed the issue of whether Kansas courts should apply the economic loss doctrine. When presented with a question of Kansas law that the Kansas Supreme Court has not resolved, the court's task is to predict how that court would rule on the issue. *Save Palisade FruitLands v. Todd,* 279 F.3d 1204,

1207 n. 1 (10th Cir.2002). In carrying out this task, the court must "follow any intermediate state court decision unless other authority convinces [it] that the state supreme court would decide otherwise." *Id.* Western Roofing has not presented the court with any persuasive reason to believe that the Kansas Supreme Court would reach a decision contrary to that of the Kansas Court of Appeals. Accordingly, the court will follow as Kansas law the Kansas Court of Appeals' decisions regarding the economic loss doctrine, which are notably in line with the majority approach on this issue. *Koss Constr.,* 25 Kan.App.2d at 205, 960 P.2d at 259.

Kan.App.2d at 744, 31 P.3d at 988. Thus, the court must define the scope of the "integrated system" of which the wire mesh screens were a part—that is, whether the integrated system consisted, for example, only of the wire mesh screens themselves or whether the integrated system encompassed the entire building.

The Kansas Court of Appeals has adopted a relatively broad view of what constitutes the relevant integrated system for purpose of the economic loss doctrine. In *Northwest Arkansas Masonry*, the court held that the integrated system of which defective cement powder was a part consisted of the entire masonry wall, and thus the costs to repair and replace the wall were barred by the economic loss doctrine. *Id.* 29 Kan.App.2d at 744–45, 31 P.3d at 988–89. The court explained that the plaintiff was best situated to assess the risk of economic loss and insure against it, and could have allocated its risk either by contracting with the cement powder supplier or the general contractor. *Id.* at 744–45, 31 P.3d at 988.

This court applied the Kansas Court of Appeals' holding in *Northwest Arkansas Masonry* in *Full Faith Church of Love West, Inc. v. Hoover Treated Wood Products., Inc.*, 224 F.Supp.2d 1285, 1289 (D.Kan.2002). In *Full Faith Church of Love,* this court held that the economic loss doctrine barred a property owner's claim for roof repair damages where the roof truss lumber and plywood sheathing decayed because it was treated with defendant's fire retardant chemical products. *Id.* at 1290. Although the court declined to dismiss plaintiff's damage claims to repair and replace "other property," it emphasized that it was ruling on the defendant's motion to dismiss and therefore had to assume that the treated wood deterioration caused physical damage to "other property" damaged as a result of the treated wood failure. *Id.; see also Prendiville,*

83 P.3d at 1261 (emphasizing that it was unclear what the "other property" was in *Full Faith* because the court was ruling on a motion to dismiss).

Most recently, in *Prendiville v. Contemporary Homes, Inc.,* the Kansas Court of Appeals evaluated the extent of the "other property" exception to the economic loss doctrine in a residential construction defect case. The allegedly defective product at issue in *Prendiville* was an artificial stucco product that was used for the exterior finish of the house. *Id.* at 1258. The basement flooded, apparently due to a defect in the stucco, and the homeowner sought damages for replacing windows and the exterior finish. *Id.* at 1259. The defendant argued the damages sought other than to replace the defective exterior finish were barred by the economic loss doctrine. *Id.* at 1264. The court applied the integrated system approach and found that the entire house was the integrated system for purposes of the economic loss doctrine. *Id.* Accordingly, plaintiff's recovery, even for damages other than to replace the allegedly defective exterior finish, was barred by the economic loss doctrine because the plaintiff was not claiming any damages other than to the structure of the house, which did not constitute "other property." *Id.*

Based on the Kansas case law to date on this issue, the court is persuaded that Kansas courts would similarly take a broad view of what constitutes the relevant product for purposes of the economic loss doctrine in this case. Thus, the court predicts the Kansas Supreme Court would find that the entire Schlage Lock building was the integrated system for which damages are barred by the economic loss doctrine. The wire mesh screens installed by Western Roofing served no purpose other than as a component of the roof drainage system. Indeed, it was precisely because

the roof needed to drain properly that they were installed to prevent pigeons from clogging the downspouts. Thus, the screens became part of an integrated system, *i.e.*, the roof drainage system, which was of course indistinguishable from the rest of the building. The court is mindful that the wire mesh screens were probably minute in size compared to the entire building, but in *Northwest Arkansas Masonry, Prendiville,* and *Full Faith Church of Love,* the allegedly defective products were similarly relatively small components that were "simply one ingredient in … larger, integrated system[s]." *Kice Indus. v. AWC Coatings, Inc.,* 255 F.Supp.2d 1255, 1259 (D.Kan.2003). The economic loss doctrine is designed to preclude plaintiffs from circumventing the law of contracts and seeking to recover in tort for what is in essence a claim for breach of contract. *United Int'l Holdings, Inc. v. Wharf (Holdings), Ltd.,* 210 F.3d 1207, 1226 (10th Cir.2000). Here, if CB Richard Ellis had wanted assurances regarding the quality of work performed by Western Roofing, these two commercial entities were quite capable of bargaining for express warranties. Whether they in fact did so is not clear from the record. Regardless of whether they did, however, the court will not now referee the terms of their agreement under tort recovery theories. Accordingly, Lexington's negligence claim, which seeks damages for building loss and business interruption, *see* Pretrial Order (Doc. 46), at 13, is barred by the economic loss doctrine.

The court notes that its conclusion on this issue is consistent with persuasive case law from other federal courts in roof defect cases. In particular, the court notes the thoughtful reasoning of the Sixth Circuit in *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.,* 276 F.3d 845 (6th Cir.2002). The defective products at issue in *Mt. Lebanon* were fire retardant chemicals that were used to treat the lumber in the trusses of a nursing home.[6] *Id.* at 847. The chemicals weakened the treated lumber, causing structural failures. *Id.* The Court gave considerable attention to defining the product because "the economic loss rule permits recovery for damages to property other than the product purchased but denies recovery for damages to the product itself." *Id.* at 849. The plaintiff in *Mt. Lebanon* argued the relevant product should be defined only to include the treated wood itself, but the Court rejected that contention, explaining that "if we were to hold that [the treated wood] is the product for economic loss rule purposes, nearly any component part would be a product and we would, as a result, effectively eviscerate the distinction between contract and tort law." *Id.* at 850. In predicting how the Kentucky Supreme Court would resolve the issue, the Court reasoned:

> the economic loss rule was established to preserve the border between contract and tort law. Where tort law is well-suited to redressing injuries to persons or property, contract law is well-suited to distributing the risk of economic loss. When parties engage in complex commercial endeavors, we think the Kentucky Supreme Court would seek to preserve their ability to distribute risks via contract and to insure against loss. With this in mind, we predict that the Kentucky Supreme Court would hold that the product for economic loss rule purposes includes the entire unit for which a party to a complex commercial

---

6. This very well may have been the same defective product that was at issue in *Full Faith Church of Love. Mt. Lebanon,* however, is more instructive here because the court in *Full Faith Church of Love* was not confronted with the issue of defining the contours of the "other property" exception to the economic loss doctrine.

transaction has the ability to distribute risk by contract and insure against loss. This rule ensures that the parties to complex commercial agreements—and not the courts—will be free to set the terms of their agreements.

*Id.* at 851. Based on this rationale, the Court concluded that the relevant product for purposes of the economic loss doctrine was the entire nursing home because the plaintiff had the ability to insure against loss with respect to the entire nursing home and/or to negotiate with the defendant for an extended warranty to insure against its risk of loss. *Id.; see also, e.g., Sebago, Inc. v. Beazer E., Inc.,* 18 F.Supp.2d 70, 90–93 (D.Mass.1998) (applying the integrated system approach and finding the relevant product for purposes of the economic loss doctrine was the entire building, not the allegedly defective roof insulation).

Accordingly, Western Roofing's motion for summary judgment on Lexington's negligence claim is granted based on the economic loss doctrine.

### B. Breach of Contract and Warranty Claims

For the reasons explained below, the court finds Lexington has raised genuine issues of material fact sufficient to withstand Western Roofing's motion for summary judgment on Lexington's breach of contract and warranty claims. Accordingly, Western Roofing's motion for summary judgment on those claims is denied.

### 1. Nature of the Claims

■ Western Roofing contends that the only express warranty it ever gave for the roof was when it installed the original roof in 1981, that the work associated with the pigeon problem was not accompanied by any express warranty, and that it did not breach the implied warranty of workmanship because it properly made the roof repairs that CB Richard Ellis hired it to make to resolve the pigeon problem. In response, Lexington argues Western Roofing breached its contractual agreement to properly fix a problem associated with leaks caused by pigeons nesting in the downspouts.

The court's analysis of the merits of Lexington's contract and warranty claims is rendered virtually impossible by the fact that the evidence is unclear regarding the precise nature of the contractual undertaking at issue in this case. On the one hand, Mr. Manson's testimony suggests that Western Roofing was hired specifically to clean out the downspouts and place wire screens over the scuppers, hence Western Roofing did not select the method of resolving the pigeon problem and should not be held responsible for the method selected. Taking all reasonable inferences in plaintiff's favor, however, as the court must in resolving Western Roofing's motion for summary judgment, Mr. Lanning's testimony suggests that Western Roofing was hired to fix the pigeon problem, in which case Western Roofing's responsibilities would have included selecting and carrying out a method to resolve that problem. The evidence in the record regarding the communications between CB Richard Ellis and Western Roofing is simply too murky for the court to ascertain whether plaintiff's claims are most properly characterized as breach of contract and/or breach of express or implied warranties.

Further, if Western Roofing was in fact contractually obligated to select an appropriate method for resolving the pigeon problem, the record contains issues of material fact regarding whether Western Roofing carried out that contractual undertaking in a proper or workmanlike manner. Certainly, it could be reasonably inferred that Western Roofing should not be held liable because the building was defectively designed in the first instance

because it did not have overflow scuppers as a backup drainage system, that CB Richard Ellis was well aware of the need to keep the screens clear of debris, and that if the wire mesh screens had not been installed the problem with dead pigeon carcasses would have continued to cause other leak problems. On the other hand, though, a rational factfinder could conclude that Western Roofing breached this agreement because it selected a method of solving the pigeon problem that ultimately prevented the roof from draining at all, failed to adequately warn CB Richard Ellis of the importance and degree of vigor needed to keep the wire mesh screens free of debris, and did not adequately take into account as a roofing contractor the obvious fact that the roof did not have a secondary drainage system. Thus, the court is unwilling to rule as a matter of law that Lexington's contract and warranty claims have no legal or factual basis.

## 2. Plaintiff's Entitlement to Maintain this Action

 Western Roofing contends Lexington is not entitled to maintain the contract and warranty claims because Westroads was not an intended third-party beneficiary of the contract between CB Richard Ellis and Western Roofing to fix the pigeon problem. The court disagrees. It appears from the record that CB Richard Ellis entered into the contract with Western Roofing in CB Richard Ellis's capacity as an authorized agent of Mid-America. Although the advisory services agreement states that it is between CB Richard Ellis and Westroads, the Westroads signature block reflects that the agreement was actually signed by Mid-America, which it can be reasonably inferred was acting in its capacity as managing agent for Westroads. Thus, Westroads hired Mid-America to manage the building, Mid-America in turn hired CB Richard Ellis to perform some of the man-

agement functions, and CB Richard Ellis was performing those functions when it contracted with Western Roofing to fix the pigeon problem. It is a basic principle of agency law that "[t]he authorized contract of the agent with a third person is the contract of the principal, and the principal may sue thereon, though not named therein, and even though he or she was an undisclosed principal at the time the agent executed the contract." 3 Am.Jur.2d *Agency* § 326, at 693 (2002) (footnotes omitted). Thus, regardless of whether Western Roofing was aware of the existence of the agency relationship between CB Richard Ellis and Mid-America, Western Roofing did in fact contract with Mid-America and Mid-America is in fact entitled to sue Western Roofing on that contract in its capacity as a party to the contract. In other words, there is direct privity of contract between Mid-America and Western Roofing. Accordingly, Mid-America is entitled to maintain an action on that contract. *See Stewart v. Mitchell Transp., Inc.,* 197 F.Supp.2d 1310, 1314 (D.Kan.2002) (plaintiff may maintain a breach of contract claim if there is privity of contract between the plaintiff and the defendant on the matter sued on (citing *Prof'l Lens Plan, Inc. v. Polaris Leasing Corp.,* 234 Kan. 742, 745, 675 P.2d 887, 891 (1984))).

Further, Western Roofing misconstrues the nature of Lexington's subrogation rights. Given the terms of the Westroads/Mid-America management agreement, it appears Mid-America was acting as an authorized agent of Westroads by obtaining insurance for the building and settling the property damage claim with plaintiff. Further, the subrogation receipt was signed by the controller of Mid-America. Lexington brings this action as a subrogee of Mid-America, not Westroads. Thus, Lexington stands in the shoes of Mid-America. *See Western Motor Co. v. Koehn,* 242 Kan. 402, 405, 748 P.2d 851,

853 (1988) ("An insurer claiming the right of subrogation stands in the shoes of its insured ...."). Because plaintiff is subrogated to Mid–America with respect to Mid–America's claims against Western Roofing, and because Mid–America had privity of contract with Western Roofing, Lexington now has privity of contract with Western Roofing. Accordingly, Lexington does not need to resort to relying on a third-party beneficiary theory to maintain this action.

### 3. Subrogation Clause

Western Roofing also contends the subrogation clause in the insurance policy forbids Lexington from being subrogated to Mid–America with respect to its claim against Midwest Roofing, which was a vendor of CB Richard Ellis. In support of this argument, Western Roofing points to the clause in the insurance policy that states the right of subrogation is waived "at the option of the insured against a ... vendor ... of the insured." Although Western Roofing may be a vendor of the insured (i.e., Mid–America or perhaps more accurately CB Richard Ellis acting in its capacity as an agent of Mid–America), there is no evidence in the record from which it can be reasonably inferred that CB Richard Ellis or Mid–America waived Lexington's right of subrogation against Western Roofing. To the contrary, the subrogation receipt expressly states that Mid–America subrogated Lexington to its rights against "any person or corporation liable for the loss," i.e., Western Roofing. Accordingly, Western Roofing's argument that Mid–America waived Lexington's right of subrogation against Western Roofing is without merit.

### 4. Effect of Insurance Benefits Paid to Mid–America on Plaintiff's Right of Subrogation

Lastly, the court rejects Western Roofing's final argument citing *King Grain Co. v. Caldwell Manufacturing Co.*, 820 F.Supp. 569 (D.Kan.1993), for the proposition that no damages are recoverable on a fully-insured loss based on breach of contract because the collateral source rule does not apply to breach of contract claims under Kansas law. Western Roofing's logic is as follows: a defendant is entitled to reduce its potential liability in a breach of contract case by the amount the plaintiff received in insurance benefits; therefore the insurance proceeds Lexington paid to Mid–America would bar Mid–America from recovering from Western Roofing; and therefore this same principle operates to defeat recovery by Lexington because Lexington as subrogee stands in the shoes of Mid–America.

The common law collateral source rule provides that "benefits received by the plaintiff from a source wholly independent of and collateral to the wrongdoer will not diminish the damages otherwise recoverable from the wrongdoer." *Rose v. Via Christi Health Sys., Inc.*, 276 Kan. 539, 544, 78 P.3d 798, 802 (2003) (quotations omitted). The collateral source rule, however, generally does not apply to contract claims. *King Grain*, 820 F.Supp. at 572; *see also* 22 Am.Jur.2d *Damages* § 394, at 357 (2003). Thus, now that Mid–America has received insurance benefits for its loss, the amount it could recover in a breach of contract claim against Western Roofing would be diminished by the amount it has already received in insurance benefits. This does not, however, mean that Lexington, which as a subrogee stands in the shoes of Mid–America, is likewise prohibited from recovering from Western Roofing.

The very nature of an insurer's subrogation right is that upon paying a loss the insurer is subrogated in a corresponding amount to the insured's right of action against a third person responsible for the loss. *See* Lee R. Russ & Thomas F. Se-

galla, Couch on Insurance § 222:5, at 222–22 to 222–34; 44A Am.Jur.2d *Insurance* § 1768, at 239–40 (2003). Thus, because an insured's right of subrogation is triggered upon payment of the loss, the logical corollary to Western Roofing's argument would be that an insured could never be effectively subrogated with respect to an insured's contract claim against a third party. This does nothing to further the purpose of subrogation, which is simply to prevent a double recovery. *Deffenbaugh Indus. v. Wilcox,* 28 Kan.App.2d 19, 24, 11 P.3d 98, 103 (2000). Here, there is no suggestion that either Lexington or Mid–America will potentially enjoy a windfall double recovery from Western Roofing if Lexington is successful. Further, there is no suggestion that Western Roofing runs the risk of being subject to double liability. To the contrary, Western Roofing will, at most, pay for the loss only once—to Lexington—which will make Lexington whole up to the amount it already paid to Mid–America as a result of the roof collapse. *Cf.* 16 Russ & Segalla, *supra,* §§ 223:49, at 223–71 to 223–72 (observing that collateral source statutes do not limit the amount an insurer may recover in a subrogation action absent a showing that the insurer stands to obtain a multiple recovery). Thus, the court is unpersuaded by Western Roofing's argument.

This conclusion is consistent with the holding in the case cited by Western Roofing, *King Grain.* In *King Grain,* the plaintiff settled the matter with its insurer for $150,000, then pursued a negligence and breach of contract action against the defendants. 820 F.Supp. at 570–71. The court observed that if plaintiff ultimately proceeded on a breach of contract theory rather than a negligence theory, the defendant could offset plaintiff's recovery by the amount of the insurance payment. *Id.* at 573. Significantly, though, the plaintiff in *King Grain* was the insured; the plaintiff was *not* an insurer pursuing its subroga-

tion rights. *Id.* (observing the plaintiff's insurer did not claim any subrogation rights with respect to the plaintiff's claim against the defendant). Accordingly, Western Roofing's reliance on *King Grain* is misplaced and Western Roofing's motion for summary judgment on Lexington's contract and warranty claims is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that Western Roofing's motion for summary judgment (Doc. 44) is granted with respect to Lexington's negligence claim but is denied with respect to Lexington's contract and warranty claims.

**IT IS FURTHER ORDERED BY THE COURT** that Western Roofing's motion to exclude expert testimony (Doc. 45) is hereby set for a hearing by telephone at **9:30 a.m. on Tuesday, May 18, 2004.**

**IT IS FURTHER ORDERED BY THE COURT** that this case is set for a limine conference in Courtroom 427 at **1:30 p.m. on Friday, May 28, 2004,** and will proceed to trial by a jury beginning at **9:30 a.m. on Tuesday, June 1, 2004.**