(827 P 2d 1195)

No. 65,538

THE ELITE PROFESSIONALS, INC., *Appellant*, v. CARRIER CORPORATION, *Appellee*.

Opinion filed March 6, 1992.

*Alan R. Welch*, of Fleeson, Gooing, Coulson & Kitch, of Wichita, for appellant.

*Stephen M. Kerwick* and *Sharon L. Chalker*, of Foulston & Siefkin, of Wichita, for appellee.

Before REES, P.J., DAVIS and PIERRON, JJ.

REES, J.: This is a products liability case. Plaintiff Elite Professionals, Inc., (Elite) a trucking company engaged in the business of interstate transportation of commodities as a common carrier, appeals from the summary judgment entered against it and in favor of defendant Carrier Corporation (Carrier) on Elite's claim for damages arising out of a truck refrigeration unit malfunction that resulted in the spoilage of a cargo of meat.

Elite seeks to recover for physical damage to property other than the refrigeration unit; compensatory damages are sought for the loss of the meat by spoilage and in the amount of the pre-incident value of the meat. Recovery is not sought for damage to the refrigeration unit occasioned by its malfunction nor for its

defective condition, that is, its qualitative defect, when sold to Elite. A qualitative defect is a defect that precludes the product from being fit for its intended use or functioning as expected for the purpose it was designed. *Daitom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1581 (10th Cir. 1984).

The refrigeration unit was manufactured by Carrier. It was a new unit when sold to Elite and mounted on an Elite reefer trailer by a Wichita, Kansas, Carrier dealer on July 22, 1987. The obvious function of a truck refrigeration unit of the sort here involved is to chill a reefer trailer's interior and its cargo.

In the trial court, Elite's asserted theories for recovery were strict liability, negligence, breach of express warranty, and breach of implied warranty. Before us, Elite has abandoned reliance upon implied warranty.

The incident giving rise to Elite's claim occurred in the course of Elite's transport of a 23-ton load of frozen hog sides from the consignor Vermont Meat Packers, Inc.'s place of business in Swanton, Vermont, to the consignee Far West Meat Company's place of business in Highland, California.

Jesse Simpson, Elite's driver for this particular shipment, picked up the hog sides on September 11, 1987, in Vermont. When loaded aboard the reefer trailer, the meat temperature was zero degrees. The meat was to be kept at that temperature until delivered to Far West in California. To accomplish that, the reefer's interior temperature needed to be kept at zero degrees.

The possibility of a refrigeration problem was first evident to Simpson at about 2:00 p.m. in the afternoon of Wednesday, September 16, 1987, when he made a routine stop at Wilson, New Mexico, to check out his truck. Simpson found that the "T-ticker" gauge on the outside of the reefer reported that the temperature inside the reefer was some three to five degrees above zero. Simpson turned the refrigeration unit's temperature control down. In addition, he telephoned Elite's headquarters in Strong City, Kansas, to report the situation to Mark Miller, Elite's president.

Miller told Simpson to proceed onward from Wilson and to call back. In the meantime, Miller would look into the matter of locating a facility to which the truck might be taken for repair of the refrigeration unit or he would make arrangements for a

driver switch, with the new driver to take the load on to its California destination.

When Simpson arrived at Gallup, New Mexico, at about 6:00 p.m., the reefer temperature had risen to about 20 degrees. Simpson reported that development to Miller by telephone. Miller instructed Simpson to continue on to Sanders, Arizona, for a driver switch. Simpson's log book reports that he arrived at Sanders at about 7:00 p.m. The switch took place that evening and the new driver, Clate Watkins, took the loaded reefer trailer to California. Watkins arrived at Far West's Highland plant when it opened at 7:30 a.m. the next day, Thursday, September 17, 1987. When the reefer was opened, it was found that the hog sides had spoiled. The reefer temperature had risen to about 60 degrees. The meat was discolored and malodorous. At the instruction of United States Department of Agriculture inspectors, the meat was not offloaded and delivery of the meat was rejected. The spoiled meat was ultimately taken to a rendering plant.

In the late afternoon of September 17, the reefer trailer was taken to a Fontana, California, Carrier service facility. There it was found that a defective component of the refrigeration unit, a solenoid valve coil, was the cause of the unit's malfunction. The coil was replaced that same afternoon at no charge to Elite.

When Elite purchased the refrigeration unit, it was given a printed warranty and disclaimer that, in material part, reads:

"MANUFACTURER'S WARRANTY TRUCK/TRAILER
REFRIGERATION UNITS

"Carrier . . . through its dealer organization shall, at their facility, during normal working hours, repair or replace with a new or remanufactured part, any parts or components of the [refrigeration unit] . . . which . . . malfunction as a result of defects in material or workmanship. . . .

. . . .

"THE FOREGOING OBLIGATION IS EXPRESSLY GIVEN IN LIEU OF ANY OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR PARTICULAR PURPOSE, WHICH EXCEEDS THE RESPONSIBILITIES SET FORTH HEREIN.

"LIMITATION OF LIABILITY

"Carrier . . . expressly disclaims and denies all liability for SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES or losses of a commercial nature arising out of a malfunctioning product or its parts or com-

ponents thereof, as a result of defects in material or workmanship. THE OWNER'S SOLE AND EXCLUSIVE REMEDY AND [CARRIER'S] SOLE AND EXCLUSIVE LIABILITY SHALL BE LIMITED TO THE REPAIR OR REPLACEMENT OF PARTS OR COMPONENTS CONTAINED IN THE [REFRIGERATION UNIT] . . . WHICH . . . MALFUNCTION AS A RESULT OF DEFECTS IN MATERIAL OR WORKMANSHIP IN ACCORDANCE WITH THE APPLICABLE PROVISIONS AND LIMITATIONS STATED ABOVE."

After discovery was conducted, Carrier filed a motion for summary judgment primarily relying upon its view of the operative effect of the printed warranty and disclaimer. The court granted summary judgment to Carrier. On reasoning that is at some variance from that suggested by either party or the trial court, we reverse.

When ruling upon the summary judgment motion, the trial court orally stated:

"The Court will find this is a contract case and not a tort case. . . . [T]here is clear and convincing evidence that the motion for summary judgment should be sustained. [The] Court is going to sustain the motion for summary judgment . . . . [T]his is strictly under a warranty claim and should not be under a tort claim. . . . [C]ertain steps might have been or should have been taken by [Elite] . . . [w]hich possibly could have resolved these issues . . . [were] not taken and Carrier should not be put in the position of that responsibility. Motion for summary judgment will be sustained."

Omitting formalities, the journal entry of judgment reporting the trial court's consideration of Carrier's motion and its grant of summary judgment to Carrier reads:

"1. On July 24, 1987, Elite Professionals purchased a new model NDJ425NO-SC-C refrigeration unit manufactured by Carrier Corporation . . . .

"2. The unit was sold with a Carrier Corporation's limited warranty which clearly and conspicuously excluded all implied warranties.

"3. The Carrier Corporation's warranty excluded all special, incidental and consequential damages.

"4. Given the contract entered into by and between the parties, [Elite's] claims against [Carrier] were limited to the contract, and no tort remedies are available to [Elite].

"5. Carrier Corporation's obligation to Elite Professionals for any defective part was to repair or replace the defective part, and this obligation was fulfilled by Carrier Corporation.

"6. There are no genuine issues of material fact and as a matter of law, Carrier Corporation is entitled to judgment."

The summary judgment motion hearing transcript and the journal entry of judgment reflect somewhat imperfect compliance with the findings of fact and conclusions of law requirement of K.S.A. 60-252, Rule 141, (1991 Kan. Ct. R. Annot. 117), and Rule 165 (1991 Kan. Ct. R. Annot. 126). For instance, there is no report of the trial court's reasoning that this is a contract case and not a tort case. Nonetheless, we conclude that the trial court granted summary judgment on the ground that the printed warranty and disclaimer operates to preclude Elite from recovery under any of its asserted theories for recovery.

The printed warranty and disclaimer may be said to be in the nature of an exclusive express limited remedy warranty. Carrier promises to repair or replace any defective parts or components causing malfunction of the refrigeration unit. In the event of refrigeration unit malfunction, Elite's sole and only remedy is repair or replacement of defective parts or components according to Carrier's promise as stated in the printed warranty and disclaimer. There is no backup remedy clause (e.g., repayment of purchase price). Carrier disclaims all liability for damage or loss arising out of refrigeration unit malfunction beyond or other than its express obligation to repair or replace defective parts or components. There is no liquidated damages clause.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. K.S.A. 1991 Supp. 60-256(c); *Patterson v. Brouhard*, 246 Kan. 700, 702, 792 P.2d 983 (1990). When a summary judgment is challenged on appeal, the record must be read in the light most favorable to the party who defended against the summary judgment motion. 246 Kan. at 702. "It is only when it can be said that reasonable persons could reach but one conclusion from the same evidence that an issue may be decided as one of law. Summary judgment should never be granted merely because the court may believe movant will prevail if the action is tried on the merits." *Williams v. Community Drive-In Theater, Inc.*, 214 Kan. 359, 364, 520 P.2d 1296 (1974); *Busch v. City of Augusta*, 9 Kan. App. 2d 119, 122, 674 P.2d 1054 (1983).

The trial court's orally expressed determination that "there is clear and convincing evidence that the motion . . . should be sustained" was an insufficient determination upon which to base its grant of summary judgment. The test to be met was whether Carrier is entitled to judgment as a matter of law and not whether the evidence, although clear and convincing to the trial court, probably would produce a judgment in favor of Carrier upon trial of the case on its merits before a jury or other factfinder.

Kansas has adopted the doctrine of strict liability as set out in Restatement (Second) of Torts § 402A (1965). *Brooks v. Dietz*, 218 Kan. 698, 702, 545 P.2d 1104 (1974). Section 402A reads:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

Within the § 402A official comments, this appears:

"*a.* This Section states a special rule applicable to sellers of products. The rule is one of strict liability, making the seller subject to liability to the user or consumer even though he has exercised all possible care in the preparation and sale of the product. . . . The rule stated here is not exclusive, and does not preclude liability based upon the alternative ground of negligence of the seller, where such negligence can be proved.

. . . .

"*f.* . . . The rule stated in this Section applies to any person engaged in the business of selling products for use or consumption. It therefore applies to any manufacturer of such a product, [and] to any wholesale or retail dealer or distributor . . . .

. . . .

"*m.* 'Warranty.' The liability stated in this Section does not rest upon negligence. It is strict liability . . . . The basis of liability is purely one of tort.

. . . [The liability] is not subject to the various contract rules which have grown up to surround [sales of goods].

. . . The rule stated in this Section is not governed by the provisions . . . of the Uniform Commercial Code, as to warranties; and it is not

affected by limitations on the scope and content of warranties . . . . The consumer's cause of action . . . is not affected by any disclaimer or other agreement, whether it be between the seller and his immediate buyer, or attached to and accompanying the product into the consumer's hands. In short, 'warranty' must be given a new and different meaning if it is used in connection with this Section. It is much simpler to regard the liability here stated as merely one of strict liability in tort."

We find that, on the record here, there is no basis for a determination that as a matter of law the printed warranty and disclaimer operates to preclude recovery by Elite on the theory of strict liability in tort.

It has been held that the defense of disclaimer is not available in a suit based upon strict liability in tort (*Pearson v. Franklin Laboratories, Inc.*, 254 N.W.2d 133, 138-39 [S.D. 1977]); where a dealer is held to be strictly liable in tort, the fact that it disclaimed warranty liability is immaterial (*Vandermark v. Ford Motor Co.*, 61 Cal. 2d 256, 37 Cal. Rptr. 896, 391 P.2d 168 [1964]); and a disclaimer of warranty will not stop a purchaser from recovering under strict liability (*Whitaker v. Farmland, Inc.*, 173 Mont. 345, 355, 567 P.2d 916 [1977]). Further, it has been said that "[s]o far as strict liability of the manufacturer is concerned, no reliance whatever can be placed upon any disclaimer." Prosser, *The Fall of the Citadel (Strict Liability to the Consumer)*, 50 Minn. L. Rev. 799, 833 (1966). "The rule [of strict liability in tort] is not governed by the provisions . . . of the Uniform Commercial Code, as to warranties; and it is not affected by limitations on the scope and content of warranties . . . . The consumer's cause of action . . . is not affected . . . by any disclaimer or other agreement. Restatement (Second) of Torts § 402A, Comment m.

*Corral v. Rollins Protective Services Co.*, 240 Kan. 678, 732 P.2d 1260 (1987), is distinguishable; it falls short as support for Carrier's opposition to Elite's reliance on strict liability.

In *Corral*, the parties' agreement provided:

" '[i]f loss or damage should result from the failure of performance or operation . . . of the [Rollins] System, that Rollins' liability, if any, for the loss or damage thus sustained shall be limited to a sum equal to ten (10%) per cent of one year's service charge, or $250.00, whichever sum is the greater, and that the provisions of this paragraph shall apply if loss or

damage, irrespective of cause or origin, results . . . from negligence, active or otherwise, of Rollins, its agents or employees.' " 240 Kan. at 680-81.

The Supreme Court affirmed the trial court's grant of summary judgment for a $250 limited recovery by Corral on the theories of negligence and strict liability.

The now pertinent portion of the *Corral* opinion deals with the liquidated damages clause in the Corral and Rollins agreement. 240 Kan. at 680-84. ("It is [Corral's] position that the trial court erred by enforcing the limitation of damages clause, and in not finding the clause violated public policy." 240 Kan. at 681. "Although this court has not previously dealt with the validity and enforceability of provisions limiting damages in contracts involving fire and/or burglar alarm systems, the vast majority of cases from our sister states dealing with the issue upholds such provisions." 240 Kan. at 682.) As to strict liability, the *Corral* decision goes no further than to hold that "[t]he limitation of liability clause is not contrary to public policy and the district court did not err in finding it valid as to the claims based upon negligence and strict liability and limiting Rollins' liability thereunder." 240 Kan. at 684. As mentioned, in the case before us there is no liquidated damages clause involved.

Meriting attention are two other matters relating to the subject of preclusion from recovery by Elite under the rule of strict liability.

Within the expression of the strict liability rule set forth in § 402A, there is found the element of "unreasonable dangerousness," that is, the necessity of an "unreasonably dangerous" defective condition. § 402A provides that "[o]ne who sells any product in a defective condition unreasonably dangerous to the . . . [user or consumer's] property is subject to liability for physical harm thereby caused to the . . . [user or consumer's] property." For Elite to recover under the rule of strict liability in the case before us of course requires that Elite prove the requisite dangerousness of the defective refrigeration unit. By relying upon strict liability, Elite has assumed the burden to prove that the refrigeration unit was unreasonably dangerous to property.

Carrier asserts that there was nothing inherently dangerous about the refrigeration unit here involved. Carrier has not dem-

onstrated to our satisfaction that on the record before us and as a matter of law the refrigeration unit was not "unreasonably dangerous." As we see it, whether the refrigeration unit was "unreasonably dangerous" is a fact question for resolution by a factfinder.

Further, threaded through Carrier's arguments is the assertion that the loss for which Elite seeks recovery is economic loss, or loss "of a commercial nature." Relying upon that assertion and the principle that recovery for economic loss is not available in an action sounding in tort, Carrier argues that Elite cannot recover for its claimed loss on the theory of strict liability because strict liability sounds in tort.

What sort of losses are economic losses? *Jones & Laughlin Steel v. Johns-Manville Sales*, 626 F.2d 280, 284 (3d Cir. 1980), approvingly refers to damages for inadequate value, costs of repair, replacement of the defective product, or consequent loss of profits as economic loss. *Fordyce Concrete, Inc. v. Mack Trucks, Inc.*, 535 F.Supp. 118, 120 (D. Kan. 1982), speaks of "'economic losses' such as loss of use of the truck [the product], loss of profits . . . or the cost of renting a temporary replacement." Elsewhere in *Fordyce*, the court approvingly refers to "purely economic losses" as a term including loss of use of the defective product, cost of replacing the product, loss of profits to plaintiff's business, or damage to plaintiff's business reputation from use of the product and observes that the definition is equivalent to the term "commercial losses." 535 F. Supp. at 123.

The harm for which Elite seeks recovery is not of the same genre as those harms encompassed within the foregoing descriptions. The harm for which Elite seeks recovery is harm to property other than the refrigeration unit itself.

Again, we conclude that the printed warranty and disclaimer here does not preclude recovery by Elite on the theory of strict liability. Recovery under strict liability is not precluded by disclaimer. Recovery is not sought for economic loss or for damage to the product, the refrigeration unit itself.

Carrier's defense of the trial court's grant of summary judgment as to Elite's claim of negligence reveals at least two contentions.

One is that there can be no recovery for economic loss on a claim sounding in tort. We have addressed that contention in our

discussion concerning Elite's strict liability claim. The contention does not pass muster. Elite makes no claim for economic loss.

As we divine Carrier's arguments, an implicitly urged contention is simply that the preclusion language of the printed warranty and disclaimer encompasses recovery in negligence.

While it is true that the policy of the law in general is to permit mentally competent parties to arrange their own contracts and fashion their own remedies where no fraud or overreaching is practiced and that contracts freely arrived at and fairly made are favorites of the law (*Kansas City Structural Steel Co. v. L.G. Barcus & Sons, Inc.*, 217 Kan. 88, 95, 535 P.2d 419 [1975]; *Kansas Power & Light Co. v. Mobil Oil Co.*, 198 Kan. 556, 559, 426 P.2d 60 [1967]), effective disclaimer of liability for one's own negligence, waiver of liability of the other party for the latter's negligence, or indemnification of the other party for its negligence is subject to strict construction and explicit expression.

In *Mid-America Sprayers, Inc. v. United States Fire Ins. Co.*, 8 Kan. App. 2d 451, 455, 458, 660 P.2d 1380, *rev. denied* 233 Kan. 1092 (1983), this is found:

" 'Contracts for exemption for liability from negligence are not favored by the law. They are strictly construed against the party relying on them. . . .' "

" 'The rule seems to be that, unless against public policy, a contract exempting liability will be enforced, however, it will be enforced very strictly. In *Cason v. Geis Irrigation Co.*, 211 Kan. 406, 507 P.2d 295 (1973), we said:

" ' "Contracts for exemption from liability for negligence are not favored by the law and are strictly construed against the party relying on them." . . .

. . . .

" ' "The general rule is that private contracts exculpating one from the consequences of his own acts are looked upon with disfavor by the courts and will be enforced only when there is no vast disparity in the bargaining power between the parties and *the intention to do so is expressed in clear and unequivocal language.* . . ."

. . . .

" ' ". . . [T]he law does not look with favor on provisions which relieve one from liability for his own fault or wrong. . . . [C]lauses limiting liability are given rigid scrutiny by the courts . . . ." ' " (Emphasis added.)

Similar statements are found elsewhere.

"[I]ndemnification for the indemnitee's own negligence must be clearly and unequivocally indicated as the intention of the parties." *United States v. Seckinger*, 397 U.S. 203, 215, 25 L. Ed. 2d 224, 90 S. Ct. 880 (1970). "The general rule is that private contracts exculpating one from the consequences of his own acts are looked upon with disfavor by the courts and will be enforced only when . . . the intention to do so is expressed in clear and unequivocal language." *Kansas City Power & L. Co. v. United Tel. Co. of Kan., Inc.*, 458 F.2d 177, 179 (10th Cir. 1972). "[I]f the indemnitee means to throw the loss upon the indemnitor for a fault in which he himself individually shares, he must express that purpose beyond any peradventure of a doubt." *Mostyn v. Delaware, L. & W. R. Co.*, 160 F.2d 15, 19 (2d Cir. 1947).

In *Corral*, as previously observed, within the parties' agreement it was provided that " '[t]he parties agree that if loss or damage should result from the failure of performance or operation . . . of the [Rollins] system, that Rollins' liability, if any, for the loss or damage thus sustained shall be limited . . . and that *the provisions of this paragraph shall apply if loss or damage . . . results . . . from negligence . . . of Rollins, its agents or employees.' "* (Emphasis added.) 240 Kan. at 680-81. That, in our view, is a clear and unequivocal expression of exemption from liability for negligence. It is a statement of exculpatory purpose beyond any peradventure of a doubt. No comparable clear and unequivocal language appears in the printed warranty and disclaimer here involved. Because like or comparable language is not within the printed warranty and disclaimer, we conclude that the printed warranty and disclaimer does not, as a matter of law, operate to preclude recovery by Elite on its asserted claim of negligence. Obviously, recovery by Elite for Carrier's purported negligence remains subject to the necessary proof of liability and damages.

We turn to consideration of Elite's claim for breach of express warranty. According to the printed warranty and disclaimer, that warranty is a limited repair or replace warranty. From the language of the printed warranty and disclaimer previously set forth, one finds that the terms and conditions of the limited remedy are expressed in this text:

"Carrier . . . through its dealer organization, shall, at their facility, during normal working hours, repair or replace with a new or remanufactured part, any parts or components of the [refrigeration unit] . . . which . . . malfunction as a result of defects in material or workmanship."

Shortly put, Carrier argues that it satisfied its repair or replace obligation when it replaced the defective solenoid valve coil upon Elite's first presentation of the malfunctioning refrigeration unit to Carrier. That occurred at the Carrier service facility at Fontana, California—*after the refrigeration unit had malfunctioned and the meat had spoiled.*

Elite's position is that the limited remedy failed of its essential purpose thereby freeing it from the exclusivity of the repair or replace remedy. Elite points to K.S.A. 84-2-719(2), where it is provided:

"Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this act [Uniform Commercial Code—Sales—Remedies; K.S.A. 84-2-701 *et seq.*]."

Elite argues that whether the limited remedy failed of its essential purpose is a fact question which, under the circumstances of this case, is for resolution by a factfinder and that the trial court's entry of summary judgment has improperly deprived it of the opportunity to try that question. We agree.

Without reiterating the evidence, we conclude that the record does not establish as a matter of law the time and place availability to Elite of normal working hours services at a Carrier facility on September 16 and 17, 1987. It strikes us that, because of the printed warranty and disclaimer's promissory recitation that "Carrier . . . shall, at their facility, during normal working hours, repair or replace [defective parts or components]," the determination of that time and place availability is critical to resolution of the express limited repair or replace promise question, particularly where resolution of that question as a matter of law is undertaken. It strikes us that if that time and place availability was such that remedial repair or replace work by Carrier was unavailable to Elite meaningfully prior to the arrival of the loaded reefer trailer at Far West's place of business on the morning of September 17, Carrier's promise was no more than illusory in the context of this case. That consequence reasonably could be

found to amount to failure of the essential purpose of the limited remedy.

In the official UCC Comments to K.S.A. 84-2-719, it is said:

"1. Under this section parties are left free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect.

"However, *it is of the very essence of a sales contract that at least minimum adequate remedies be available.* If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be *at least a fair quantum of remedy* for breach of the obligations or duties outlined in the contract. . . . [U]nder subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article." (Emphasis added.)

When Simpson and the loaded reefer arrived at Gallup, the circumstances confronting Elite required it to choose the most expedient reasonable course of action to take to protect its cargo. It appears that the decision made was that, in view of the times and places involved, it was the better choice to get the load to Far West in Hayward directly. The reasoning seems to have been that by making a direct run to Hayward it was more likely that the arrival of the cargo there would be earlier than when assistance at a Carrier service facility might be obtained.

Also arising in this case is the question whether the K.S.A. 84-2-719(2) failure of essential purpose rule is applicable in a situation where the seller is not given the opportunity to repair or replace until after the damage causing occurrence but it does, in fact, repair or replace promptly after presentation of the defective product to it. In the case before us, a fair argument may be made that in the context of the existing circumstances, the limited repair or replace remedy failed of its essential purpose.

A Wisconsin court was faced with a comparable situation in *Phillips Petroleum v. Bucyrus-Erie Co.*, 131 Wis. 2d 21, 388 N.W.2d 584 (1986). There, a manufacturer used substandard steel in the fabrication of parts for cranes used in off-shore oil drilling. The parts failed, one crane fell into the sea, and the company was prohibited from using the remaining cranes until the defective parts were replaced. 131 Wis. 2d at 24-25. The court determined the limited replacement or repair remedy failed of its essential

purpose. The court noted the purpose of any damage award is to make the injured party whole, and while most often replacement of a defective part will suffice, it did not in that case. The court further noted that replacement of the parts only "minusculely compensated the purchaser." The court found it "apparent that the remedy offered by [the] Bucyrus-Erie's contract . . . provides damages that are, in the circumstances, unconscionably low." 131 Wis. 2d at 39.

We conclude the fact that the seller is first given the opportunity to repair or replace after the harmful occurrence does not, standing alone, bar recovery for failure of essential purpose at least in those instances where the outcome of the repair or replacement leaves the user in the position of one who has been afforded an unconscionably inadequate remedy, that is, where the user has not been afforded a reasonably "fair quantum of remedy."

Whether the remedy failed in this case is a question of fact and should not have been decided on summary judgment. See 5 Anderson, Uniform Commercial Code § 2-719:29 (1984). In *Delhomme Industries, Inc. v. Houston Beechcraft*, 669 F.2d 1049, 1063 (5th Cir. 1982), the court, applying Kansas law, stated the determination of a claim under K.S.A. 84-2-719(2) is a question of fact rather than one of law. Also, in *Erie County Water Auth., Etc. v. Hen-Gar Const.*, 473 F. Supp. 1310, 1315 (W.D. N.Y. 1979), the court determined that more factual development was necessary and that need precluded summary judgment on the issue of whether the limited replacement or repair remedy had failed of its essential purpose.

In summary, we conclude that the summary judgment against Elite must be reversed. It was improvidently granted. On the present record, the printed warranty and disclaimer does not preclude recovery by Elite on its asserted strict liability, negligence, or warranty theories as a matter of law.

Reversed and remanded for further proceedings.