Savannah **BOLES**, Petitioner

v.

**SUN ERGOLINE, INC.**, a Delaware corporation, Respondent.

No. 08SC970.

Supreme Court of Colorado,
En Banc.

Feb. 8, 2010.

Miller & Law, P.C., James F. Scherer, Littleton, Colorado, Attorneys for Petitioner.

Hall & Evans, L.L.C., Peter J. Moyson, Denver, Colorado, Attorneys for Respondent.

Campbell, Latiolais & Ruebel, P.C., Jeffrey Clay Ruebel, Casey A. Quillen, Janine Lynn Yaxley, Denver, Colorado, Attorneys for Amicus Curiae Colorado Defense Lawyers Association and Colorado Civil Justice League.

Justice COATS delivered the Opinion of the Court.

Boles petitioned for review of the court of appeals' unpublished opinion affirming a summary judgment in favor of Sun Ergoline, the manufacturer of a tanning booth in which she was injured. The district court found that Boles's strict products liability claim was barred by a release she signed as a condition of using the tanning facilities. On direct appeal, the court of appeals concluded that the district court correctly applied the four-part test prescribed by this court for deter-mining whether exculpatory agreements releasing service providers from liability for their simple negligence comport with public policy.

Because an ordinary consumer's agreement to release a manufacturer from liability for injuries caused by its product cannot, consistent with public policy, extend to claims for strict products liability, the district court erred in analyzing the release question as if Boles's claim were one for damages alleging simple negligence. The judgment of the court of appeals is therefore reversed with directions to remand for further proceedings consistent with this opinion.

## I.

Savannah Boles brought suit against Sun Ergoline, Inc., asserting a strict products liability claim for personal injury.[1] Sun Ergoline moved for summary judgment, countering that Boles's claim was barred by a release she signed prior to using its product. The trial court agreed and granted Sun Ergoline's motion on the basis of the following undisputed facts.

Executive Tans operated an upright tanning booth manufactured by Sun Ergoline. Prior to using the booth, Boles signed a release form provided by Executive Tans that contained the following exculpatory agreement: "I have read the instructions for proper use of the tanning facilities and do so at my own risk and hereby release the owners, operators, franchiser, or manufacturers, from any damage or harm that I might incur due to use of the facilities." After entering the booth, several of Boles's fingers came in contact with an exhaust fan located at the top of the booth, partially amputating them.[2]

On direct appeal, the court of appeals affirmed. In doing so, it found, among other things, that the language of the release was broad enough to include any damage or harm that might occur due to Boles's use of the facilities; that nothing in the law of this

---

1. By the time of the third and final amended complaint, this was the only claim remaining against Sun Ergoline. Boles also asserted a number of other claims against other parties at various points in the litigation process.

2. The exhaust fan assembly, (including the fan guard that allowed Boles fingers to contact the fan), was manufactured by a different company, with whom Boles settled.

jurisdiction precludes a release from insulating a manufacturer from liability for a defective product; and that there existed no genuine issue of material fact suggesting willful and wanton conduct or gross negligence by the defendant. It then applied the four-part test we announced in *Jones v. Dressel*, 623 P.2d 370, 376 (Colo.1981), as the district court had also done, and found no violation of public policy.

We granted Boles's petition for a writ of certiorari challenging the court of appeals' determination that the exculpatory agreement barred her strict products liability claim.

## II.

■ More than a quarter century ago, this court rejected the assertion that any agreement purporting to shield a party from liability for its own tortious conduct would violate the public policy of the jurisdiction. *Jones*, 623 P.2d at 376. Instead we held that although an exculpatory agreement attempting to insulate a party from liability for its own simple negligence may be disfavored, it is not necessarily void. *Id.; see also B & B Livery, Inc. v. Riehl*, 960 P.2d 134, 136 (Colo.1998) ("Generally, exculpatory agreements have long been disfavored."). We there delineated four factors to be considered in determining whether such a release agreement should be enforced to bar a claim for damages premised on simple negligence. *Jones*, 623 P.2d at 376 ("[T]here are four factors which a court must consider: (1) the existence of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language.").

■ We designed the *Jones* factors to ensure that agreements to release a party from liability for its simple negligence, although not void as against public policy in every instance, are closely scrutinized for particular circumstances or context that might nevertheless render them invalid. *See Chadwick v. Colt Ross Outfitters, Inc.*, 100 P.3d 465, 468 (Colo.2004); *B & B Livery*, 960 P.2d at 136; *Heil Valley Ranch, Inc. v. Simkin*, 784 P.2d 781, 784 (Colo.1989).

We did not, however, suggest that the factors we identified in *Jones*, with regard to claims of simple negligence, would also be adequate or appropriate to determine the validity of release agreements with regard to other kinds of tort claims. Quite the contrary, at precisely the same time we made clear that in no event could public policy permit an exculpatory agreement to shield against a claim for willful and wanton conduct, regardless of the circumstances or intent of the parties. *Id.* And more recently, we have identified other public policy considerations invalidating exculpatory agreements, without regard to the *Jones* factors. *See Cooper v. Aspen Skiing Co.*, 48 P.3d 1229, 1232 & n. 5 (Colo.2002) (concluding that public policy protecting children prevents parents or guardians from releasing their children's prospective negligence claims) *superseded by statute*, § 13–22–107, C.R.S. (2009).

In *Bradford v. Bendix–Westinghouse Automotive Air Brake Co.*, 33 Colo.App. 99, 107, 517 P.2d 406, 411 (1973), the court of appeals determined that this jurisdiction's doctrine of strict liability with regard to cases involving manufactured products was "correctly defined" in the Restatement (Second) of Torts § 402A (1965), and shortly thereafter this court ratified that determination. *See Hiigel v. General Motors Corp.*, 190 Colo. 57, 63, 544 P.2d 983, 987 (1975). The General Assembly immediately responded by defining "Product liability action" and "Manufacturer," and over time provided further limiting definitions and defenses applicable only to product liability actions. *See, e.g.*, §§ 13–21–401 to –406, C.R.S. (2009) (general provisions); §§ 13–21–501 to –505, C.R.S. (2009) (firearms and ammunition); § 13–22–104, C.R.S. (2009) (medical transplants and transfusions). It has never, however, fundamentally altered the nature of, or rationale for, a strict products liability claim.

■ "Strict products liability" has been described as a "term of art that reflects the judgment that products liability is a discrete area of tort law which borrows from both negligence and warranty" but "is not fully congruent with classical tort or contract law."

Restatement (Third) of Torts: Products Liability § 1 cmt. a (1998). Rather than resting on negligence principles, it "is premised on the concept of enterprise liability for casting a defective product into the stream of commerce." *Smith v. Home Light & Power Co.*, 734 P.2d 1051, 1054 (Colo.1987) (quoting *Jackson v. Harsco Corp.*, 673 P.2d 363, 365 (Colo.1983)); *see also Camacho v. Honda Motor Co.*, 741 P.2d 1240, 1246 (Colo.1987). In strict products liability, the focus is on the nature of the product rather than the conduct of either the manufacturer or the person injured. *See, e.g., Forma Scientific, Inc. v. BioSera, Inc.*, 960 P.2d 108, 115 (Colo.1998); *Camacho*, 741 P.2d at 1246; *Smith*, 734 P.2d at 1054 (quoting *Jackson*, 673 P.2d at 365).

■ As such, strict products liability evolved to accommodate, and is driven by, public policy considerations surrounding the relationship between manufacturers and consumers in general, rather than any particular transaction or contract for sale. In addition to the typical inaccessibility of information and inequality of bargaining power inherent in any disclaimer or ordinary consumer's agreement to release a manufacturer, a claim for strict products liability is also premised on a number of public policy considerations that would be flatly thwarted by legitimizing such disclaimers or exculpatory agreements. Not least among these is the deliberate provision of economic incentives for manufacturers to improve product safety and take advantage of their unique "position to spread the risk of loss among all who use the product." *Smith*, 734 P.2d at 1058; *see also Camacho*, 741 P.2d at 1246–48.

Without fanfare or extended discussion, perhaps because it follows so inexorably from its policy justifications for recognizing this cause of action in the first place, the Second Restatement of Torts clearly indicates that exculpatory agreements between a manufacturer and an end-user can have no effect. *See* Restatement (Second) of Torts § 402A cmt. m ("The consumer's cause of action ... is not affected by any disclaimer or other agreement ... attached to and accompanying the product into the consumer's hands.").

And although the expanded and more sophisticated discussion of this matter in the Third Restatement distinguishes "the majority of users and consumers" from consumers "represented by informed and economically powerful consumer groups or intermediaries, with full information and sufficient bargaining power," who "contract with product sellers to accept curtailment of liability in exchange for concomitant benefits," the Third Restatement would even more emphatically prohibit "contractual exculpations" from barring or reducing otherwise valid products liability claims for personal injuries by ordinary consumers against sellers or distributors of new products. *See* Restatement (Third) of Torts: Products Liability § 18 & cmt. d.[3]

There appears to be virtually universal agreement on this point among the other jurisdictions considering the question. *See, e.g., Vandermark v. Ford Motor Co.*, 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 168, 172 (1964); *Westlye v. Look Sports, Inc.*, 17 Cal.App.4th 1715, 22 Cal.Rptr.2d 781, 796 (1993); *Sipari v. Villa Olivia Country Club*, 63 Ill.App.3d 985, 20 Ill.Dec. 610, 380 N.E.2d 819, 823 (1978); *Elite Prof'ls, Inc. v. Carrier Corp.*, 16 Kan.App.2d 625, 827 P.2d 1195, 1201 (1992); *Phipps v. General Motors Corp.*, 278 Md. 337, 363 A.2d 955, 962 (1976); *Webster v. Empiregas Inc.*, 648 S.W.2d 198, 200 (Mo.Ct.App.1983); *Ruzzo v. LaRose Enters.*, 748 A.2d 261, 268 (R.I.2000).

In order to resolve the case before us, we consider it unnecessary, and in fact unwise, to attempt a comprehensive description of the kind of "economically powerful consumer groups" or bargained-for consideration that might conceivably permit, consistent with public policy, a release from claims of strict products liability. It is enough here that an agreement releasing a manufacturer from strict products liability for personal injury, in exchange for nothing more than an individual

---

**3.** Restatement (Third) of Torts: Products Liability section 18 reads as follows: "Disclaimers and limitations of remedies by product sellers or other distributors, waivers by product purchasers, and other similar contractual exculpations, oral or written, do not bar or reduce otherwise valid products liability claims against sellers or other distributors of new products for harm to persons."

consumer's right to have or use the product, necessarily violates the public policy of this jurisdiction and is void.

### III.

Because the lower courts erred in applying the four-part test of *Jones* to a strict products liability claim and in finding the exculpatory agreement in this case enforceable, the judgment of the court of appeals is reversed with directions to remand for further proceedings consistent with this opinion.