No. 116,307

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CORVIAS MILITARY LIVING, LLC,
and
CORVIAS MILITARY CONSTRUCTION, LLC,
*Appellants,*

v.

VENTAMATIC, LTD., and JAKEL, INC.,
*Appellees.*

SYLLABUS BY THE COURT

1.

The Kansas Product Liability Act, K.S.A. 60-3301 *et seq.*, governs all product liability actions, consolidating them into one basis for liability regardless of theory.

2.

The economic loss doctrine—which is judicially created—bars a purchaser of an allegedly defective product from recovering from a manufacturer under a tort theory for damages that are solely economic.

3.

Originally, the economic loss doctrine only applied to prevent recovery for damages to the product itself. Over the years, the application of the economic loss doctrine has been expanded to other circumstances.

4.

Kansas courts have adopted the integrated systems approach. If a component part or component product is considered to be part of the integrated system, the damage to that property is considered to be damage to the product itself.

5.

In determining whether a component part and the damaged property are an integrated system, courts must determine whether the component part is integral to the functioning of or indistinguishable from the damaged property.

Appeal from Geary District Court; BENJAMIN J. SEXTON, judge. Opinion filed June 2, 2017. Reversed and remanded.

*Charles L. Philbrick*, of Rathje & Woodward, LLC, of Wheaton, Illinois, and *William J. Bahr*, of Arthur-Green, LLP, of Manhattan, for appellants.

*James P. Nordstrom* and *Seth A. Lowry*, of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, for appellee Ventamatic, Ltd.

*David E. Rogers* and *Daniel J. Buller*, of Foulston Siefkin LLP, of Wichita, for appellee Jakel Motors Inc.

Before BRUNS, P.J., HILL and SCHROEDER, JJ.

BRUNS, J.: Corvias Military Living, LLC, and Corvias Military Construction, LLC, (collectively referred to as "Corvias") appeal a summary judgment granted in favor of Ventamatic, Ltd., and Jakel, Inc., by the district court. Corvias originally filed this lawsuit against multiple defendants, alleging that bathroom exhaust fans installed in private housing units constructed for the families of military personnel stationed at Fort Riley were defective. Corvias claimed that a defective motor in the exhaust fans caused

two fires and widespread malfunctions. Ventamatic manufactured the exhaust fans, and Jakel made the electrical motors used in the fans.

Prior to the entry of summary judgment, Corvias voluntarily dismissed all of the defendants except for Ventamatic and Jakel. In granting summary judgment to Ventamatic and Jakel, the district court found that the economic loss doctrine barred recovery. Specifically, the district court found that the bathroom exhaust fans and the housing units were integrated systems. In addition, the district court determined that Corvias could not recover under an implied warranty theory because bathroom exhaust fans are not inherently dangerous.

Because we find that the bathroom exhaust fans and the housing units are not part of an integrated system, we conclude that the district court erred in finding that the economic loss doctrine barred Corvias from proceeding on its product liability claim against Ventamatic and Jakel. In light of this conclusion, we do not reach the issue of whether the exhaust fans were inherently dangerous. Accordingly, we reverse and remand this case for further proceedings.

FACTS

Corvias built, owns, and manages the Fort Riley Privatized Family Housing Project. Over the past 10 years, Corvias has constructed a substantial number of private housing units—including houses and townhouses—for the families of military personnel stationed at Fort Riley. Through its subcontractors, Corvias purchased 3,785 "NuVent" bathroom exhaust fans manufactured by Ventamatic. Although the exact number is unclear from the record, electrical motors made by Jakel powered at least some of the exhaust fans. It is undisputed that Corvias is not in privity with either Ventamatic or Jakel.

On June 12, 2012, a fire occurred in one of the housing units at Fort Riley built by Corvias. It is alleged that a defective electrical motor in a NuVent bathroom exhaust fan that had been installed in the unit caused the fire. Several months later, on February 5, 2013, a fire occurred in another housing unit constructed by Corvias. Once again, Corvias alleged that a defective electrical motor in a NuVent bathroom exhaust fan caused the fire. Shortly after the second fire, Corvias disconnected and removed all of the remaining NuVent bathroom exhaust fans that had been installed in the housing units at Fort Riley. Corvias then replaced the NuVent fans with bathroom exhaust fans built by a different company.

Moreover, Corvias retained an expert who opined that the Jakel motor is defective because it has a coil wrapped with a material that is susceptible to catching fire. Similarly, the expert opined that the NuVent fan is defective in its design because the motor coil is exposed to airborne dust that can lead to a fire. Corvias' expert concluded that these defects caused the fires in the two housing units at Fort Riley. In addition, the expert concluded the defects would exist in all of the NuVent bathroom exhaust fans that utilized electrical motors made by Jakel.

On June 11, 2014, Corvias filed an action in Geary County District Court against Ventamatic, Jakel, and several other defendants. Subsequently, Corvias filed an amended petition in which it asserted a product liability claim, claims for breach of express and implied warranties, a quantum meruit claim, and a claim under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 (2012). Additionally, Corvias asserted a breach of contract claim against two subcontractors involved in the purchase and installation of the NuVent bathroom exhaust fans. Ultimately, Corvias voluntarily dismissed its claims against all of the defendants except Ventamatic and Jakel.

Ventamatic and Jakel filed motions for summary judgment contending, among other things, that the economic loss doctrine precluded Corvias from recovering damages

from them. Ventamatic and Jakel also asserted that Corvias could not pursue an implied warranty claim because bathroom exhaust fans are not inherently dangerous. The district court agreed and granted summary judgment to both Ventamatic and Jakel. Thereafter, Corvias filed a notice of appeal.

ANALYSIS

*Standard of Review*

On appeal, Corvias contends that the district court erred in granting summary judgment to Ventamatic and Jakel. Corvias argues that the district court erred in finding that its claim for damages against Ventamatic and Jakel was barred by the economic loss doctrine. In addition, Corvias argues that the district court erred in finding that it could not recover damages from Ventamatic under an implied warranty theory.

The well-known standard of review relating to summary judgments was recently summarized in *Apodaca v. Willmore*, 306 Kan. ___, 392 P.3d 529 (2017):

> "'When the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. The district court is required to resolve all facts and inferences that may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules as the district court.'" 392 P.3d at 533 (quoting *Apodaca v. Willmore*, 51 Kan. App. 2d 534, 538, 349 P.3d 481 [2015]).

See also K.S.A. 2016 Supp. 60-256(c)(2).

5

Furthermore, determining whether the economic loss doctrine applies in a case is an issue of law subject to unlimited appellate review. *Rinehart v. Morton Buildings, Inc.*, 297 Kan. 926, 931, 305 P.3d 622 (2013); see also *David v. Hett*, 293 Kan. 679, 682-83, 270 P.3d 1102 (2011); *Koss Construction v. Caterpillar, Inc.*, 25 Kan. App. 2d 200, 201, 960 P.2d 255, *rev. denied* 265 Kan. 885 (1998).

*Kansas Product Liability Act*

For more than 35 years, the Kansas Product Liability Act, K.S.A. 60-3301 *et seq.*, has governed all product liability actions, consolidating them into one basis for liability regardless of theory. See L. 1981, ch. 231, sec. 7; *David*, 293 Kan. at 685. In particular, the provisions of the Act apply to actions based on "strict liability in tort, negligence, breach of express or implied warranty, breach of, or failure to, discharge a duty to warn or instruct, whether negligent or innocent, misrepresentation, concealment or nondisclosure, whether negligent or innocent, or under any other substantive legal theory." K.S.A. 60-3302(c). Moreover, "comparative fault applies to all product liability claims regardless of the theory of recovery." *Jones v. Tanks Plus*, No. 108,029, 2013 WL 678368, at *3 (Kan. App. 2013) (unpublished opinion) (citing K.S.A. 60-258[a]; *Forsythe v. Coats Co.*, 230 Kan. 553, Syl. ¶ 1, 639 P.2d 43 [1982]; *Kennedy v. City of Sawyer*, 228 Kan. 439, 450, 618 P.2d 788 [1980]).

The Kansas Product Liability Act applies to "any claim or action brought for *harm* caused by the manufacture, production, making, construction, fabrication, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging, storage or labeling of [a] product." (Emphasis added.) K.S.A. 60-3302(c). The Act defines the term "harm" to include property damage, personal injuries, and death. It also includes "mental anguish or emotional harm attendant to . . . personal physical injuries, illness or death." K.S.A. 60-3302(d). However, the definition of the term "harm"

6

under the Act does not include "direct or consequential economic loss" caused by a defective product. K.S.A. 60-3302(d).

Economic loss is defined as "loss of use of the defective product, cost of replacing the product, loss of profits to plaintiff's business, or damage to plaintiff's business reputation from use of the product." *Elite Professionals, Inc. v. Carrier Corp.*, 16 Kan. App. 2d 625, 633, 827 P.2d 1195 (1992). Economic loss includes the "loss of the bargain, repair, and replacement cost, loss of profits, and/or goodwill, including diminution in value." In other words, economic loss is those damages that arise as a "result of the failure of the product to perform to the level expected by the buyer, which is the core concern of traditional contract law." *Northwest Arkansas Masonry, Inc. v. Summit Specialty Products, Inc.*, 29 Kan. App. 2d 735, 742, 31 P.3d 982 (2001).

*Economic Loss Doctrine*

What has become known as the "economic loss doctrine" was judicially created by the California Supreme Court in *Seely v. White Motor Co.*, 63 Cal. 2d 9, 45 Cal. Rptr. 17, 403 P.2d 145 (1965). Subsequently, the economic loss doctrine was also adopted by the United States Supreme Court in *East River S.S. Corp. v. Transamerica Delaval*, 476 U.S. 858, 106 S. Ct. 2295, 90 L. Ed. 2d 865 (1986). Twelve years later, this court adopted the economic loss doctrine in *Koss*, 25 Kan. App. 2d 200. Since that time, the scope of the doctrine in Kansas has continued to unfold. See *Rinehart*, 297 Kan. at 932-36; see also *David*, 293 Kan. at 683-95; Breer and Pulikkan, *The Economic Loss Rule in Kansas and Its Impact on Construction Cases*, 74 J.K.B.A. 30 (2005); Treaster, *The Confusion Continues: The New Dynamic of the Economic Loss Doctrine in Kansas*, 62 Kan. L. Rev. 1325 (2014).

In *East River*, the United States Supreme Court considered a product liability case—arising in the context of admiralty law—in which four oil tankers were allegedly

7

damaged by defective high-pressure turbines. In considering the issue of whether the plaintiff could recover in tort for damage to the tanker caused by the defective turbines, the Supreme Court expressed concern that if an injured party was allowed to recover purely economic loss in a product liability action, "contract law would drown in a sea of tort." 476 U.S. at 866. The Supreme Court reasoned that "[e]ven when the harm to the product itself occurs through an abrupt, accident-like event, the resulting loss due to repair costs, decreased value, and lost profits is essentially the failure of the purchaser to receive the benefit of its bargain—traditionally the core concern of contract law." 476 U.S. at 870 (citing E. Farnsworth, Contracts § 12.8, pp. 839-40 [1982]). Thus, the Supreme Court unanimously held "that a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." 476 U.S. at 871.

In 1998, this court adopted the economic loss doctrine in the context of a commercial product liability action in *Koss*, 25 Kan. App. 2d 200. In *Koss*, the plaintiff sued the manufacturer in tort for damage to a vibratory roller—used to compact materials in highway construction projects—allegedly caused by defective hydraulic hoses. In affirming the district court's granting of summary judgment to the defendant, this court found that "*East River* provides a rule that is straightforward and predictable and that establishes a logical demarcation between cases properly pursued as tort actions and those which are warranty claims." 25 Kan. App. 2d at 205. It noted that this approach was consistent with Restatement (Third) of Torts:  Products Liability § 21(c) (1998) as well as with the rationale articulated in *Elite Professionals*, 16 Kan. App. 2d at 633. *Koss*, 25 Kan. App. 2d at 205-06. Accordingly, this court held that "[u]nder Kansas law, the economic loss doctrine applies to a claim for damage to the product itself." 25 Kan. App. 2d at 207.

The following year, this court expanded the economic loss doctrine to include consumer transactions in *Jordan v. Case Corp.*, 26 Kan. App. 2d 742, 993 P.2d 650

8

(1999), *rev. denied* 269 Kan. 933 (2000). In *Jordan*, the plaintiff alleged that he purchased a combine with a defective engine. The engine subsequently caught on fire, destroying the combine as well as some unharvested wheat. On appeal, this court found that the engine was a component part of the combine and held "that the rule set forth by this court in *Koss* applies equally to a consumer of defective goods as well as to commercial buyers of defective goods." 26 Kan. App. 2d at 744.

In 2001, this court considered the economic loss doctrine in the construction context in *Northwest Arkansas Masonry, Inc.*, 29 Kan. App. 2d 735. In *Northwest*, the plaintiff was hired as a subcontractor to build concrete walls for a new Home Depot store. The plaintiff alleged that cement powder it had purchased from the defendant to make mortar was defective, causing it to have to tear down and rebuild the walls after 20,000 concrete blocks had been laid. Although a jury ruled in favor of the plaintiff, the district court set aside the verdict. In affirming the district court's decision, this court found that the allegedly defective cement powder was used to make mortar and had been "integrated" into the final product—the masonry wall—and, as a result, the economic loss doctrine barred the recovery of the damages sought by the plaintiff. 29 Kan. App. 2d at 745.

Three years later, in *Prendiville v. Contemporary Homes, Inc.*, 32 Kan. App. 2d 435, 83 P.3d 1257, *rev. denied* 278 Kan. 847 (2004), a panel of this court applied the economic loss doctrine in a residential construction case. In 2011, however, the Kansas Supreme Court overruled the holding in *Prendiville* in *David*, 293 Kan. at 703. Specifically, our Supreme Court held in *David* that "[t]he economic loss doctrine should not bar claims by homeowners seeking to recover economic damages resulting from negligently performed residential construction services." 293 Kan. 679, Syl. ¶ 2. Subsequently, this court applied the holding in *David* in the case of *Coker v. Siler*, 48 Kan. App. 2d 910, 917, 304 P.3d 689 (2013).

Also in 2013, the Kansas Supreme Court reexamined the economic loss doctrine in *Rinehart*, 297 Kan. 926. In *Rinehart*, the owners of a preengineered building—intended to be used for both residential and commercial purposes—sued the builder for damages under several theories, including negligent misrepresentation. Our Supreme Court held that "negligent misrepresentation claims are not subject to the economic loss doctrine because the duty at issue arises by operation of law and the doctrine's purposes are not furthered by its application under these circumstances." 297 Kan. at 941.

In summary, it appears that the trend to expand the economic loss doctrine has slowed in recent years. As noted by the Kansas Supreme Court,

> "[i]n one sense, the 'economic loss doctrine' or 'economic loss rule' is a well-recognized tort concept, but a review of the caselaw across various jurisdictions shows it has proven difficult to define because there are a number of permutations. Johnson, *The Boundary-Line Function of the Economic Loss Rule*, 66 Wash. & Lee L. Rev. 523, 524 (Spring 2009)." *David*, 293 Kan. at 683.

This case presents one such permutation—the application of the integrated systems approach.

*Application of Integrated System Approach*

In granting summary judgment in favor of Ventamatic and Jakel, the district court concluded "that the 'integrated systems' rule applies to the bathroom exhaust fans and the housing units into which they were installed." It is undisputed that "Kansas has adopted the integrated systems approach in which damage by a defective component of an integrated system to the system as a whole or any system component is not damage to 'other property.'" *Coker*, 48 Kan. App. 2d at 916. Thus, we must determine whether the integrated systems approach is applicable in this case.

10

In *Northwest Arkansas Masonry, Inc.*, this court held "that '[d]amage [caused] by a defective component of an integrated system to either the system as a whole or other system components is not damage to "other property" which precludes the application of the economic loss doctrine.'" 29 Kan. App. 2d at 744 (quoting *Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 249, 593 N.W.2d 445 [1999]). Accordingly, we concluded that "when component materials become *indistinguishable parts of a final product*, and there is harm resulting from a defective component of the product, the product itself has caused the harm." (Emphasis added.) 29 Kan. App. 2d at 744; see also Restatement (Third) of Torts: Products Liability § 21 (1998).

Our decision in *Northwest Arkansas Masonry, Inc.* provides insight to the question of when the integrated systems approach is applicable. As noted above, in that case this court determined the final product was the masonry wall and that the cement powder used to make mortar was an integrated component product necessary or essential to make the wall. Moreover, the cement powder used to make mortar to bind the concrete blocks together became an *indistinguishable* part of the wall. Here, even if we assume that the final product was the housing units themselves rather than the bathroom exhaust fans, we do not find that the fans became an indistinguishable part of the house once they were installed. Rather, we would suggest that the bathroom exhaust fans were easily distinguishable from the other property that was damaged in the fires.

As we did in *Northwest Arkansas Masonry, Inc.*, we again look to a Wisconsin case for guidance. In *State Farm Fire and Cas. Co. v. Hague Quality Water, International*, 345 Wis. 2d 741, 826 N.W.2d 412 (2012), *aff'd* 352 Wis. 2d 308, 841 N.W.2d 819 (2014), the Wisconsin Court of Appeals considered the issue of whether a plaintiff could recover under a tort theory from the manufacturer of an allegedly defective water softener unit that caused substantial damage to the drywall and woodwork in a house. The trial court granted summary judgment to the manufacturer on the grounds that

11

the economic loss doctrine barred recovery. On appeal, the Wisconsin Court of Appeals reversed and remanded the case for further proceedings.

In reversing the trial court's decision, the *Hague* court clarified the test applied in determining whether a defective product and damaged property are part of an integrated system. 345 Wis. 2d at 747-48. Referring to the Wisconsin Supreme Court's decision in *Wausau Tile*, the Wisconsin Court of Appeals found "that the defective product must be an *'integral' part of the larger system* that includes the damaged property for the two to be considered parts of an integrated system." (Emphasis added.) 345 Wis. 2d at 748 (citing *Wausau Tile*, 226 Wis. 2d at 251). "Therefore, a defective product must be *integral to the function of the damaged property* before the defective product and the damaged property may be considered part of the same integrated system." (Emphasis added.) 345 Wis. 2d at 748.

The *Hague* court went on to point out that the defective component product in *Wausau Tile* was cement that became "integral to the creation" of the damaged final product—concrete paving blocks. 345 Wis. 2d at 748-49 (citing *Wausau Tile*, 226 Wis. 2d at 251-52); see also *Cincinnati Insurance Co. v. AM International, Inc.*, 224 Wis. 2d 456, 463, 591 N.W.2d 869 (1999) (defective component product was a gear that was an integral part of a damaged printing press). The Wisconsin Court of Appeals contrasted these cases, and others, in concluding that "the water softener at issue in this case was not integral to the functioning of [the house's] drywall, flooring, and woodwork." 345 Wis. 2d at 749. Thus, the court held "that the water softener and damaged drywall, flooring, and woodwork [in the house] are not part of an integrated system." 345 Wis. 2d at 749.

Like the Wisconsin Court of Appeals, we conclude as a matter of law that a defective product must be integral to the function of the damaged property before the defective product and the damaged property may be considered part of the same integrated system. We note that the word "integral" means "[e]ssential or necessary for

12

completeness; constituent." The American Heritage Dictionary 911 (5th ed. 2016). Accordingly, in order to be integral, the damaged property must be unable to function properly without the allegedly defective product.

We find this conclusion to be consistent with the holdings in previous Kansas product liability cases. Just as the cement powder and mortar was essential for the construction of the masonry wall in *Northwest Arkansas Masonry, Inc.*, the hydraulic hoses in *Koss* were essential for the functioning of the vibratory roller. *Northwest Arkansas Masonry, Inc.*, 29 Kan. App. 2d at 744; *Koss*, 25 Kan. App. 2d at 207. Similarly, in *Jordan*, the engine that caught on fire was essential to the operation of the combine. 26 Kan. App. 2d at 743-44.

In each of these cases, the allegedly defective product was an integral, necessary, essential, or indistinguishable part of the property that was damaged. In contrast, we find that the bathroom exhaust fans at issue in this case are not integral, necessary, essential, or indispensable to the functioning of the damaged housing units. We, therefore, hold that the allegedly defective bathroom exhaust fans and the housing units are not part of an integrated system.

*Conclusion*

We find as a matter of law that the bathroom exhaust fans and the housing units constructed at Fort Riley were not part of an "integrated system" as that term is defined in the context of product liability law. As such, we further find as a matter of law that the economic loss doctrine does not preclude Corvias from asserting a product liability claim against Ventamatic and Jakel. Thus, we conclude that Corvias may proceed on its claim for damages under the Kansas Product Liability Act.

In light of our conclusion, it is unnecessary for us to address the issue of whether the bathroom exhaust fans were inherently dangerous. As the district court correctly noted, the Kansas Product Liability Act "consolidates all product liability actions, regardless of theory, into one basis for liability." *David*, 293 Kan. at 685; see also *Griffin v. Suzuki Motor Corp.*, 280 Kan. 447, 461, 124 P.3d 57 (2005); *Patton v. Hutchinson Wil-Rich Mfg. Co.*, 253 Kan. 741, 756, 861 P.2d 1299 (1993). Accordingly, we will not consider the implied warranty claim separately.

Reversed and remanded for further proceedings.